[PHILADELPHIA, FEBRUARY 11th, 1839.]

## BURR *against* SIM & Others.

### IN ERROR.

1. The English rule that in the case of an absent person, of whom no tidings are received, the presumption of the continuance of life ceases at the end of seven years, is adopted in this state.

2. But the presumption of death, as a limitation of the presumption of life, must be taken to run exclusively from the termination of the prescribed period; so that the jury are bound to presume that the person lived throughout the whole period of seven years, unless there are circumstances in evidence to quicken the time.

3. The circumstances which are sufficient to take a case out of the operation of the rule, must be such as show that the individual was at some particular date, in contact with a *specific* peril.

4. Mere general perils are not sufficient; and, therefore, the departure of a person for the Spanish Main, in or about the year 1792, without any account of him ever having been received down to the year 1837, was held not to be sufficient to authorise a direction to the jury that they might infer his death to have taken place in or before 1797.

5. It is not error in a judge to tell a jury that a witness was "a very willing witness," and that "very little confidence was to be placed in her testimony:" nor to remark upon the strength or absence of evidence, or to suggest presumptions arising from the relationship and conduct of one of the parties.

6. It seems that a party may except to a charge generally, and is not bound to state or specify at the time, the particular parts of the charge objected to.

THIS was a writ of error to the District Court for the City and County of Philadelphia, to remove the record of an action of eject-ment, brought by George Sim, Margaret Sim, Jean Anderson and Peter Nicholson, against Postrema Burr, to recover a messuage and lot of ground, situate on the north side of Mulberry (or Arch,) street between Second and Third Streets, in the city of Philadel-phia.

The property in question, together with an adjoining house and lot, belonged, in the year 1782, to the Rev. George Craig, a clergy-man of the Episcopal Church, who in that year made his will, wherein he authorised and directed his executors, to sell his real estate, and to pay the proceeds into the hands of two persons, to be held by them in trust for his son Archibald Cummings Craig, to

(Burr *v.* Sim.)

apply the interest thereof to his maintenance and support during his minority, and to pay the principal to him on his arriving at full age. The houses were not in fact sold, after the death of the testator. Archibald Cummings Craig, the son and devisee of the testator, arrived at the age of twenty-one years, and died on or about the 5th day of September, 1797, unmarried and without issue; but having made a will, by which he devised to Mrs. Marcia Ross, wife of Captain David Ross, of the city of Philadelphia, " or to her heirs and assigns, one three story brick house in Arch street, No. 63." And added, " Further I wish to give unto Dr. William Curry, of the city of Philadelphia, one other three story house in Arch street, No. 65 ;" which house was the subject of this ejectment.

Dr. William Currie died in the year 1828, leaving two children, viz., Isabella, married to J. G. Williams, and William, who conveyed all his interest in the premises to the said J. G. Williams. The defendant, Postrema Burr, came into possession during the lifetime of Dr. William Currie, as his tenant. The said J. G. Williams was admitted to defend as landlord.

The heirs of Archibald Cummings Craig, on the part of his *father*, were the issue of a paternal uncle and aunt who resided in Scotland. They were the plaintiffs in the ejectment.

The mother of A. C. Craig was twice married; first to a Dr. James Currie (the brother of Dr. William Currie,) by whom she had issue one son, William James Currie; and second, to the Rev. George Craig, by whom she had issue also one child only, Archibald Cummings Craig. His next of kindred on the mother's side, after his half-brother, were two first cousins; viz., 1st, John Ewer Sword, 2d, Ann Sword, married to Dr. Nathan Dorsey, and the issue of another first cousin.

The case was tried on the 28th of April 1834, when, under the directions of the Court, a verdict was rendered for the plaintiffs. The case was removed to this Court by writ of error; and it was decided by this Court, that by the directions in the will of the Rev. George Craig, to sell his real estate, this property was in equity converted into personal estate, and that on his electing to receive it as real estate, A. C. Craig took it as a new acquisition, and not as coming to him *ex parte paterna*, and, consequently, that it went to the heirs *ex parte materna*, as well as to those *ex parte paterna*. This Court also decided, that Dr. William Currie took only a life estate in the premises under the will of A. C. Craig.*

A *venire de novo* having been ordered, the cause came on for trial

* 1st *Wharton's Rep.* 252, (*Burr.* v. *Sim.*)

(Burr *v.* Sim.)

again, before STROUD, J., on the 15th of February, 1837, when the will of the Rev. George Craig was given in evidence, and the facts already stated with respect to the pedigree of the plaintiffs and the kindred of the first cousins, *ex parte materna*, were admitted.

On the part of the defendants a witness, Mrs. Marcia Ross, was called, the material part of whose testimony was as follows:—

"I knew Archibald Cummings Craig. He died in 1797; I think in September. I knew his mother. Her maiden name was Margaret Haly. Her first husband was Dr. James Currie. He was a doctor of medicine. There were children of that marriage. There were two children. The eldest died in infancy. . The youngest was William James Currie. He was alive in 1792. I don't know any thing further than what I have heard his family say. I have no personal knowledge. I have heard his mother say that he left this country for South America; and also his late uncle, Dr. William Currie, I have heard repeatedly say it. They said it was in 1792 he left this country. He embarked from New York." Being cross-examined, the witness said, " Mrs Craig died in 1793, about September, of the yellow fever. I don't know if Mrs. Craig's mother died before or after her. It was from the family I heard that he sailed from New York; all my knowledge is derived from them. I never saw the young man. I can't say exactly how long before Mrs. Craig's death I had conversation with her. I was very young at the time; just turned of fourteen. Mrs. Craig lived in Arch-street, No. 63, the house devised to me. My acquaintance commenced with her in the year 1793. Perhaps about June 1793. I never saw William James Currie at any time to my knowledge. Archibald C. Craig lived with his uncle, Wm. Currie for some time after his mother's death, and then went to lodgings. He lived with his mother before. I was intimately acquainted with A. C. Craig. I never heard in what vessel William J. Currie went, nor in what capacity he went. All my knowledge of the former marriage is derived from the family. William J. Currie was the intimate friend of my husband, Captain David Ross. They were educated together. I was no relation of Mrs. Craig. My husband was a relation of the Currie family. The grandmother of William J. Currie was a Miss Ross, daughter of the Rev. George Ross of New Castle. Dr. James Currie had other brothers besides Dr. William Currie, but they were dead before my time. One was living. I think his name was John. I did not know him. I believe he left children; but I don't know them. I did not hear to what part of South America William J. Currie went. He was not brought up a mariner. As I was informed, I think he was going there to settle. I heard from both Dr. Currie and Mrs. Craig, that he went away in 1792. Previous to my acquaintance with Mrs. Craig, I had not any

acquaintance with the Currie family." And being re-examined in chief, the witness said, "Dr. William Currie left two children, William and Isabella, who is now Mrs. Williams. William is dead."

The defendants' counsel then produced and read in evidence, the will of Mrs. Margaret Craig, the material part of which was as follows:—

"After my funeral charges and other debts are discharged, I do hereby devise, bequeath, and leave, all my real and personal estate to my beloved son, William Currie; excepting my gold watch, rings, and a suit of mourning, to my dear son Archibald Craig. But if my son William Currie should die unmarried, or if being married should die without issue, then, and in that case, it is my will and direction, that the whole of my personal and real estate, shall descend and devolve on my nephew Richard Currie, his heirs and assigns forever. And for the performance of this my last will and testament, I do hereby constitute and appoint the Revd. Dr. Sam'l M'Gaw, and Dr. William Currie, my joint executors."

The defendants' counsel then read in evidence the notes of the testimony of Hugh Ferguson, a witness examined on the former trial, and who had since died. He stated on his cross-examination, that

"George Craig married Margaret Haley, and I believe her name was Currie before she married George Craig. I believe her husband's name was James Currie. I can't recollect positively. I have an impression that there was a son by the first marriage. Don't recollect hearing of his death. I think it probable that his name was William, as he had an uncle of that name, Dr. Currie. I think the late Dr. Currie was brother of the first husband of Mrs. Craig. I think there was no other than one son. * * * * * * * * I believe Dr. Currie was the brother to the first husband, and of course, uncle to the half-brother. I can't speak positive as to their being such a half-brother. It is my impression that there was a son of that name. I can't say if he died before or after A. C. Craig."

The counsel for the plaintiffs then produced and read in evidence the will of Penelope Haly, dated the 10th day of February, 1792, and the codicil thereto, dated the 17th day of October, 1793.

The material parts of the will were as follows:—

After appointing the Rev. Ashbel Green and Robert Ralston, of the city of Philadelphia, her executors, she gave to her daughter for life a certain messuage and lot of ground on the north side of Jones's Alley, and the will then proceeded:—

"And from, and immediately after the decease of my said daughter Margaret, I give and devise unto my grandson, William Currie, (who is the son of my said daughter Margaret, and is gone to parts beyond the seas,) his heirs and assigns, all that, the afore-

said messuage or tenement and lot of ground, situate on the north side of Jones's alley, in the said city, together with the appurtenances, to hold to him the said William Currrie, his heirs and assigns, forever. But if it shall happen that my said grandson shall not return from parts beyond the seas, nor be living at the time of the decease of his mother, the said Margaret, then, and in that case, but not otherwise, I give and devise unto my grand-daughter Mary Thompson, her heirs and assigns, all that the aforesaid messuage or tenement, and lot of ground, situate on the north side of Jones's alley, in the said city, together with the appurtenances, to hold to her my said grand-daughter, Mary Thompson, her heirs and assigns, forever. But my mind and will is, that if the said William Currie, shall return from parts beyond the seas, and be living at the decease of his said mother (my said daughter Margaret,) he shall, after her decease, have, hold, and enjoy the aforesaid messuage, tenement, and lot of ground, situate on the north side of Jones's alley, in the said city, as the same are devised to him in manner aforesaid, any thing hereinbefore contained to the contrary thereof, in any wise notwithstanding."

She then gave to her grand-daughter, Mary Thompson, in fee, a messuage and lot on Cherry street, and several legacies to her daughter Penelope Sword, and her grand-children. Then came the following :—

" Item. I give and bequeath unto my said grandson William Currie, the like sum of one hundred pounds, current money aforesaid, in specie, to be paid to him out of the moneys payable to me upon bond from the said Hugh Ferguson. But it is my will, that if the said William Currie shall be dead at the time of my decease, then, and in that case, but not otherwise, the said legacy of one hundred pounds, so bequeathed to him as aforesaid, shall go, and I give and bequeath the same unto my grandson, Archibald Craig, son of my said daughter Margaret."

After several other bequests and directions, the testatrix devised and bequeathed all the rest, residue and remainder of her estate, real and personal, to her daughters Margaret Craig, and Penelope Sword, and her grand-daughter Mary Thompson.

By the codicil reciting that since the making of her will her daughter Margaret Craig had departed this life, and that she was desirous to make a new disposition of her house and lot in Jones's alley, she devised the same to her grand-daughter Ann Dorsey, in fee.

The plaintiff's counsel further gave in evidence certain inventories of the estate of Mrs. Haly, and two settlements of the accounts

(Burr *v.* Sim.)

of her estate.   The first of these settlements was made on the 13th of February, 1795, and the last on the 11th of May, 1813, and it appeared from them, that several payments had been made between 1795 and 1797, to Robert Ralston, in trust for "the heirs of Mrs. Margaret Craig;" that finally, on the 6th of May, 1813, Dr. William Currie, as administrator of the estate of Wm. James Currie and A. C. Craig, deceased, who were sons and heirs at law of Margaret Craig, deceased, and heirs at law of Mrs. Penelope Haly, deceased, was paid, "by consent of the heirs of estate," one-third of the residue, and that the remaining two-thirds, were paid to Mrs. Sproat and Mrs. Dorsey, &c.

The plaintiff's counsel further produced an appraisement of the estate of Mrs. Margaret Craig, and a settlement by Dr. Currie of her estate ; also a bond given by Dr. William Currie as administrator of the estate of William James Currie, dated March 23d, 1812, and an affidavit made by him on the same day, in which the said W. J. Currie is described as a "mariner;" also a paper purporting to be a will made by Dr. William Currie, dated the 21st of February, 1821, (but not proved in the register's office,) the only material part of which was the following passage :—

"There is another house and lot in Strawberry or Arch st. near Second street, numbered 65 ; but being also a life-estate, after my decease, will become the property of the heirs of the said Archibald Cummings Craig."

The plaintiff's counsel further produced the administration bond of the estate of A. C. Craig, and the inventory and settlement of the same.   Also certain letters from Dr. Currie, to Thomas Bradford, Esq. (the attorney for the heirs in Scotland,) dated July 6th, 1815, August 1st, 1816, August 23d 1816, September, 28th, 1816, and June 27th, 1817 ; which letters related to a proposed arrangement for the sale of the premises in question on the basis of Dr. Currie having only a life-estate therein ; and also to a proposed compromise of their respective claims to the personal property to A. C. Craig ; also a letter dated May 26, 1813, from Dr. Currie to James Milnor, Esq. the attorney for the heirs in Scotland, containing the following passages :—

"The late Margaret Craig, who died in September, 1793, had a son named William Currie, by her first husband, Doctor James Currie, who was brother to the subscriber.   She also had a son by her second husband, the Rev. George Craig, named Archibald Cummings Craig.   Margaret Craig's son, William Currie, who had returned to Philadelphia after an absence beyond the seas of five years, the latter end of the year 1791, and left it again for N. York on the 27th November, 1792, for the purpose, as he reported, of going on board a vessel then in that port, bound on a speculating voyage

(Burr *v.* Sim.)

to the Spanish Main, since which time he has never been heard of by me or any other person that I know of.

Archibald C. Craig, son of Margaret Craig, by her second husband, died on the 7th September, 1797, in the 22nd year of his age; previously to which, he devised and bequeathed certain parts of his estate or property by will, which has been regularly proved and registered, to different persons; but having omitted to devise or direct the distribution of part of his personal property, the late Doctor Nathan Dorsey and the subscriber administered to that part, the net proceeds of which remaining in my custody at the time of my settlement at the register's office in the year          amounted to about $1480; and about $2000 remained to be accounted for, by the administrators of the estate of the late Dr. Dorsey, who had been my colleague in the administration: and he died before settlement was made at the register's office. Part of the residuary portion of the estate of the late Penelope Haley, mother of Mrs. Craig, to a certain portion of which the heirs of Mrs. Craig, (Mrs. Currie and A. C. Craig) were heirs at law, was paid by Mr. Robert Ralston, one of Mrs. Haley's executors, to A. C. Craig, a short time before his decease: the remainder was reserved by Mr. Ralston, together with a small specific legacy for William Currie, son of Margaret Craig, or his legal representatives. This property consists of loan office certificates, and amounts at present to $1217 50 nominal, valued by M'Ewen & Hale, brokers, at $904 real.

This sum, with $1480 for which I am accountable, $1000 in the hands of George Read, Jun. administrator to estate of late Dr. Dorsey, in North American Insurance Company stock, which, according to the statement of the late Mr. Dorsey, is all that remains of the money belonging to Craig's estate that was received by Dr. Dorsey, excepting $300 advanced by the said Dr. Dorsey to the late Captain Sword, on a presumption that he, being the son of Craig's mother's sister, was one of the heirs at law—the whole added together making $3680.

I am informed by gentlemen, conversant with the laws of this state, that I have consulted, that if William Currie, the son of Margaret Craig by her first husband James Currie, was alive, at the date of the decease of his grandmother, Mrs. Haly, which occurred in October, 1793, and *died* between the time of her decease, and the enacting of the law relative to the distribution of intestates' estates, in April 1794, his legacy, and portion of the residuary estate, would have passed to the children of his father's and mother's brothers and sisters, and not to his grandfather, grandmother, or uncles, by either father or mother, nor to his half-brother, A. C. Craig; but if he was alive at the time the said law was enacted, in 1794, and died between that period and the time of the decease of the said half-brother, A. C. Craig, in 1797, all the property to which he was entitled, his half-brother Craig, agreeably to that law, would have

(Burr *v.* Sim.)

been entitled to: but if he survived Craig, then he, the said William Currie, would have been sole heir to the whole of Craig's intestate property, &c.   And if he died since his half-brother, Craig, and before his grandfather, the Rev. W. Currie, who died in October, 1803, his said grandfather, as nearest in degree of kindred to him, would have been heir at law to the said W. C., son of Margaret Craig.   And if he is dead, and died since the time of his grandfather's decease, my brother and myself, the sons of the said Rev. W. Currie, would now be heirs at law to the whole of the property in dispute.

As the question, however, which of the half-brothers, Currie or Craig, died first, has not, and perhaps never can be, ascertained, I have proposed a compromise, by which the two branches of the claimants in Scotland, the Craig's and the Sim's, should receive twelve hundred dollars between them; *i. e.* the Craig branch $600 and George Sim and his sister $600; the remainder to be divided between Craig's and Currie's relatives in this country.   To this proposal, Judge Hemphill, agent for the Craig's branch in Scotland, and the claimants on the part of Craig in this country, and myself, as administrator to Currie's estate, are willing to agree.   It, therefore, only now remains with George Sim and his sisters to have the business brought to a final and amicable conclusion, unless some unexpected difficulty should oppose that I am at present unacquainted with."

The counsel for the plaintiff, then read by consent from his notes, the testimony of James Peters, taken on the former trial, who testified in substance, that he was tenant of the premises in 1819, and for about eight years afterwards; and that Dr. Currie objected to give him a lease of them, on the ground that he had only a life estate.

The counsel for the defendants then again called Mrs. Marcia Ross, who testified as follows:—"I believe that William J. Currie had been to sea, previous to 1792.   I think it was said he had been absent four or five years then.   I have heard his relations say he was born about 1768 or 1769.   Dr. Currie had another daughter, Cornelia.   She died before her father in 1818—and a daughter called Margaretta Rose.   She is dead.   She died young.   About nine years old.   She was never married."   Being cross-examined, she said, "All that I know about William J. Currie is from hearsay. I dont know that I ever saw him."

The counsel for the defendant then read, by consent, the notes of the evidence of Dr. Condie, taken on the former trial, who testified in substance, that for the last ten years of Dr. Currie's life, he became childish, and was frequently engaged in making wills and revoking them.   That in a conversation held by the witness

(Burr *v.* Sim.)

with him about 1817, " he appeared to be afraid of a nephew named William ; spoke of a man who had recently come to trouble him. Would converse somewhat foolishly about him ; spoke of him as a dissipated man : seemed afraid of his getting his property. I never saw him myself. Spoke of his having reappeared. Afraid of his taking away his property," &c.

The evidence having been closed on both sides, the defendants' counsel requested the judge to charge the jury upon certain points propounded in writing, as follows :—

" 1. That on the death of Archibald Cummings Craig, the messuage and lot on Arch street, which are the subject of this ejectment, passed as a new acquisition, (subject to the life estate of Dr. Currie,) and not as if it came to him on the part of his father.

2. That if A. C. Craig died without leaving a widow or child, father or mother, brother or sister of the whole blood, but if he left a brother of the half blood, such brother would take the estate in preference to some remote kindred of the whole blood.

3. That if William J. Currie, half-brother of A. C. Craig, is proved to have been living in 1792, at the age of 22 or 23 years, the proof of his death before September, 1797, devolves upon the plaintiff in this case.

4. That unless there are circumstances showing the death of William Currie, to have taken place before the death of A. C. Craig, on the 5th of September, 1797, the presumption of the law is, that he lived until and beyond that time.

5. That unless the plaintiff prove to the satisfaction of the jury, that William J. Currie died on or before the 5th of September, 1797, the defendants are entitled to their verdict.

6. That the circumstances necessary to repel the legal presumption of the continuance of life for the period of seven years, must be *facts,* established by sufficient evidence; and that the *opinions* of the family or others, are not sufficient for that purpose."

The learned judge charged the jury as follows :—

" This is an action of ejectment for a house and lot in Arch street. Both parties claim under the will of George Craig; and it is not necessary to go farther back than that. By this will he gave power to his executors to sell this property, and bequeathed the proceeds to his son, on certain conditions, which, it is agreed by the parties, were complied with. Archibald C. Craig died on the 5th, or according to Dr. Currie, on the seventh of September, 1797, about twenty-two years of age. · His will appears evidently to have been made while he was in extremis. By this he devised the house to

(Burr *v.* Sim.)

Dr. Currie. The Supreme Court have decided that he had the estate for his life; and no doubt rightly. It is a matter about which hardly two lawyers would disagree. Dr. Currie therefore was entitled to possession during his life—until 1828. The present claimants could not institute any action till his death. The reversion did not pass by the will of A. C. Craig. He died intestate as to that. Under his father's will, some nice questions occurred. On the former trial, the charge of the judge was excepted to; and on a writ of error the Supreme Court decided, 1st, That the real estate was impressed with the character of money. 2nd, That A. C. Craig had an election to take it as money or land; and having treated it in his will as land, this was considered as evidence of his intention to take it as land. He died, therefore, seized of it as land. The Supreme Court went a step further, and decided, that though first money and then land; and though originally the property of his father, yet that his son took it as a new acquisition—as if it had been actually purchased by him. This is a matter of great importance to one of the parties in this cause; for if it had been taken by devise or descent, it would have gone to the heirs on the part of his father exclusively. The Supreme Court have decided, however that it was a new acquisition; and whatever my opinion might have been, and whether or not this decision is in conformity with the settled doctrines of the law previously, are matters of no importance on this trial. Right or wrong, as that Court is constitutionally the Court of the last resort, its decisions are the law of the land. And if the plaintiffs wish to controvert that decision, they must do so by excepting to my opinion, as now distinctly and unequivocally declared to you, that A. C. Craig took this property by his election, as a new acquisition. The effect of this decision is, that if a half-brother of A. C. Craig, were now living, he would, without question, on the other proof in this cause, be solely entitled to this property; and if such an individual had existence, and survived A. C. Craig for a single minute, the defendants, as his heirs, or, what is the same thing, as heirs of Doctor William Currie, would, in like manner, be entitled to retain their possession. That Margaret Craig, as the wife of Doctor James Currie, had a son named William James Currie, and that he lived to manhood, is not seriously contested. His grandmother's will, and his mother's will, Mrs. Ross's testimony, and Doctor Currie's letters, all establish this. No doubt, he was a son of Mrs. Craig, and half-brother of A. C. Craig. His existence being established, the law presumes the continuance of his life, until the contrary be shown. This must be shown by the plaintiffs. The burden of proof is on them. It must be shown by the plaintiffs, that he did not exist on the day when A. C. Craig died, which is fixed as the fifth or seventh of September, 1797. How, then, is the death of William James Currie made out? Not by such evidence as that a witness was present when he died, or attended his funeral. It is to be inferred, the plaintiffs say, from

circumstances—from the lapse of time since he was last heard of, and the circumstances connected with the last account we have of him. The law is, that after the lapse of seven years from the time when, on proper inquiry, a person is last heard of, he is presumed to be dead. This presumption, in point of law, supplies the place of direct proof of death. If, therefore, prior to the death of A. C. Craig, seven years had elapsed, since William James Currie was last heard of, the defence, as to the parts claimed by the plaintiffs, would be unavailing. It is all important therefore, to ascertain when he was last heard of. Now, when was he last heard of? This is a question of fact, and for your determination. I do not consider the point quite so clear, as it seems to have been thought by counsel. Dr. Currie, it is true, fixes the precise time—the very day—November 27, 1792. Mrs. Ross, who was but fourteen years of age in 1793, says he left this country for South America, in 1792. She says she heard this from his mother. Mrs. Craig's will leaves him a legacy, without alluding to his absence. But Mrs. Haly's will appears, to me to furnish the most important evidence on this point. It contains a devise to him, on the death of his mother. Her language is, ' my grandson, William Currie, (who is the son of my daughter Margaret, and is gone to parts beyond the seas.)' She speaks in the present tense. This languge may seem, perhaps, to imply, that he had not been very long absent. Yet she asserts, that he was then gone to parts beyond the seas; and she adds afterwards, ' If the said William Currie shall return from parts beyond the seas.' That he was absent, would seem an unavoidable inference, as to her belief, at the date of her will. Now this bore date February 10, 1792—more than nine months earlier than the time fixed by Dr. Currie, as the very day he left this city. (Here the judge read that part of Dr. Currie's letter of May 26, 1813, in which he speaks of William James Currie's departue from this city, in order to sail for New York.) Doctor Currie says, that after an absence of four years, he returned to Philadelphia—to this city— the latter end the year 1791, and left again, on the 27th of November, 1 The defendants say, that the grandmother may have had allusion to this first absence : and Mrs. Ross is brought up a second time to give, (and certainly she is a very willing witness,) a corroboration of the fact of this first absence. She says, ' I *believe* William James Currie had been to sea before he went in 1792. I *think* it was said he was then absent four or five years." What sort of testimony is this? She says, too, that he was not a mariner, and that she thinks he went to settle in South America—Yet Doctor Currie swears he *was* a mariner, and in his letter says he went on a *speculating voyage*. Mrs. Haly's will is almost irresistible in establishing the fact, that William James Currie was absent on on the 10th of February, 1792. But according to Doctor Currie's letter, he returned to this city in the latter end of 1791 ; and did not

(Burr v. Sim.)

leave for his voyage, till November, 27, 1792; so that, according to this, he was probably in the bosom of his family, at the very time when his grandmother says he *was gone to parts beyond the seas*— I think the inference, then, a fair one, and as such submit it to the jury for their consideration, that the time when Wm. James Currie was last heard of, was more remote than it is fixed by Dr. Currie: that he has made a mistake of at least a year, if not more. I think it right therefore to submit to you, whether you are not justified in presuming that more than seven years elapsed after he went away and was last heard of, before the 5th of September, 1797. If so, then the legal presumption comes in, that he must have been dead, at the time of his brother's death. This is a question of probability, from the evidence, with nothing to oppose it, but the recollections of Doctor Currie, penned more than twenty years after the event, and the loose testimony of Mrs. Ross, which deserves but little confidence. If you believe that he went away before the 5th of September, 1790, and has not been heard of since his departure, you need not trouble yourselves to inquire as to when he died. But if you think that he has been heard of since this time, you are to consider if he died since, and when. This is purely a question of fact, for the jury box. For although the law presumes the death of an individual, after the lapse of seven years, without being heard of, yet it does not decide that he necessarily continued to live throughout the entire seven years. The probability of his living throughout that period, or dying within it, is great or small, according to circumstances. If a person were traced up to the scene of some conflagration, in which many lives were proved to have been lost—such, for instance, as the burning of the Richmond theatre— if a soldier or sailor known to have been engaged in battle at a particular time—or the inhabitant of a place visited by a destructive disease—or one on board a vessel at sea, exposed to a severe storm —could not, on inquiry be heard of afterwards, a strong probability of the death of each of these would arise; and such circumstances being proved in a case, would warrant a jury to infer death in less time than seven years from the period when the individual was last heard of. The only circumstance here is the going to sea. (Here the judge read part of Dr. Currie's letter to Mr. Milnor, dated May 26, 1813.) I think it a fair inference from this, that he did embark from New York. If you think so, then you have a right to take into consideration all the hazards of the sea, of whatever nature or description. In the case read from the 27th volume of the English Common Law Reports, the party went to America, and was not heard of afterwards. There was no other evidence. The Court said the jury had a right to presume his death, within the seven years; that it was not to be taken as a legal conclusion, that he must have lived throughout the seven years. The presumption of the continuance of life ceases after the lapse of seven years from the time when a

(Burr *v*. Sim.)

person is last heard of; and a jury may presume him, without doubt, as then dead; but they may infer his death within that time, from circumstances proved in the case. It is a question of fact for the jury; and as such, I leave it entirely with you. In reference to the accounts and other documents connected with the settlement of the estates of Mrs. Haly, Mrs. Craig, and A. C. Craig, which have been given in evidence; they have but a very remote application to the points in dispute. You may, however, take them for what you think they are worth. One object of this testimony was to show the conduct and interest of Dr. Currie. It was certainly his interest in the first place to show that William J. Currie outlived his mother and grand-mother, and yet died before April 19th, 1794; for as he says, he would then have been entitled to the legacies to William J. Currie under their wills. It was especially his interest, that William J. Currie should be shown to have outlived his brother A. C. Craig. He was bound by affection to make inquiries about him, as his nephew. It is natural to suppose, therefore, that he did make inquiries, and yet he has not chosen to communicate any information as to whether he did or not. He contents himself with stating simply the time of his nephew's leaving the city, the object he had in view, and that neither he (Dr. Currie) nor any one else, that he knew of, ever heard of him afterwards. As to Mr. Ralston's accounts, they shed but little light. He chose to act cautiously. Until 1812 or 1813, no letters of administration were taken out on the estate of William James Currie. There was no one therefore authorised to demand payment of the legacies bequeathed to him before that time. The account of Mr. Ralston was settled shortly afterwards. On the whole, if you think yourselves justified to infer from the evidence, that William James Currie has not been heard of since seven years preceding his brother's death, you ought to presume his death, and give your verdict for the plaintiffs for the shares they claim. If you do not think right so to infer, then if you conclude that he died before his brother, though heard of within seven years preceding his death, your verdict should also be for the plaintiffs. But if you do not think yourselves justified to make either of these inferences, your verdict should be for the defendant."

In reference to the points propounded by the defendants' counsel the learned judge charged as follows:—

"To the 1st point.—I have already charged on the affirmative on this point. This is the express decision of the Supreme Court.

To the 2nd point.—This is so.

To the 3rd point.—I answer this precisely as requested. My remarks to you on the general charge, were to the same effect.

To the 4th point.—I have already stated that the law presumes the death of an individual, after the lapse of seven years from the

(Burr *v.* Sim.)

time he is last heard of. In this case it is not pretended on either side that W. J. Currie has been heard of since the 28th of November, 1792, more than forty-five years ago. All presumption of the continuance of his life, has long since ceased. It is certainly competent to the jury to consider his life to have continued till the full expiration of seven years from the time when they find he was last heard of; and if that period overreaches the time of A. C. Craig's death, according to their conclusion from the evidence, they may find that W. J. Currie outlived A. C. Craig. But the jury have the undoubted right to infer the death of W. J. Currie to have taken place before A. C. Craig, and although seven years had not then elapsed since W. J. Currie was last heard of, if they find any circumstances to have been proved which renders such an inference probable. If no such circumstances have been proved in their opinion, they will not be justified in presuming his death within seven years.

To the 5th point.—I answer this as requested.

To the 6th point.—Undoubtedly mere opinion of the family should be discarded, and the evidence from which the jury are to draw inferences, must be facts: what these are the jury will ascertain."

The defendants' counsel tendered a bill of exceptions to this charge, which the learned judge sealed, adding the following:

" After the foregoing charge was given, the defendants' counsel, before the jury retired, stated that they excepted to the charge; and being called upon to specify the particular parts excepted to, said, that the jury had been told that there was no evidence of the time when William James Currie was last heard of. I then replied that I recollected no such remark; and told the jury, to prevent all misapprehension as to what I had said, or meant to say, on that subject, I would state, that the evidence given on that subject was not definite and conclusive in its character: that though Doctor Currie had mentioned a particular day, yet other evidence had been received, which rendered his recollection doubtful: and that upon the whole evidence, it was a question of fact for them to say, when Wm. J. Currie was last heard of. That they were not bound down to the day mentioned by Dr. Currie, if they thought other and better evidence showed him to have been mistaken. The same counsel then added, that they excepted to its being left to the jury, to find from the circumstances in proof, that admitting William James Currie had been heard of, within seven years previous to the death of his brother, but not after the time named by Doctor Currie, his death had taken place before his brother's; and this was the only exception taken by them.

And thereupon the counsel for the said defendant did then and there except to the aforesaid part of the charge and opinion of the said Court, &c."

The jury found a verdict for the plaintiffs, and the defendants' counsel removed the record by writ of error, and filed the following specifications.

" 1. Because the judge of the District Court charged the jury that after the lapse of seven years, the law presumes the death of a person not heard of; but that within the seven years, it is a matter of fact for the jury.

2. Because the judge refused to charge the jury as requested by the defendants' counsel; that unless there were circumstances, showing the death of William J. Currie to have taken place before the death of A. C. Craig, on the 5th of Sept. 1797, the presumption of law is, that he lived until and beyond that time.

3. Because the judge refused to charge the jury as requested by the defendant's counsel, that unless the plaintiff prove to the satisfaction of the jury, that William J. Currie, died on or before the 5th of Sept. 1797, the defendants are entitled to their verdict.

4. Because the judge told the jury, that the law does not presume that a man lived during seven years from the time that he was last heard of.

5. Because the judge told the jury that a witness on the part of the defendants, whose testimony was not impeached or questioned, was a " very willing witness," and that " very little confidence was to be placed in her testimony."

6. Because the judge told the jury, that a certain will, produced on the part of the plaintiff, was " irresistible," in establishing a certain fact, viz., the absence of W. J. Currie at a certain time.

7. Because the judge told the jury, there was " no evidence at all," or " no distinct evidence, to fix the period when William J. Currie went away;" whereas there was the positive oath of a respectable and unimpeached witness, that he went away in the year 1792; and in a document produced by the plaintiff's counsel, and not impeached and contradicted in any way, it was stated that he went away on the 27th November, 1792.

8. Because the judge told the jury, that if they believed that W. J. Currie went away before the 6th September, 1790, *their labours would cease,* and the defence would be unavailing, although there was no evidence whatever to create a belief that he went away as early as the year 1790, although he was proved to be in existence in the year 1792; and although the only evidence whatever of his death was the letters of administration taken out in the year 1812.

9. Because the said judge told the jury, that it was a fair presumption that Dr. Currie " did make inquiry, did ascertain the fact,"

(*i. e.* of the death of William J. Currie prior to the said day) " and did not choose to communicate it;" whereas the only evidence in relation to this, was a letter of Dr. Currie produced by the plaintiff's counsel, in which he expressly asserted, that nothing was ever heard of or from W. J. Currie after he left here.

10. Because the judge told the jury, that they might infer from the circumstances, that W. J. Currie died, at any time within seven years after he was last heard of, although there was not a single fact or circumstance proved in the cause, from which such an inference could legally be drawn.

11. Because the judge took the facts from the jury, and charged them upon a supposed or presumed state of facts.

12. General errors."

Mr. *T. I. Wharton*, for the plaintiff in error.

The learned judge before whom this cause was tried, has stated in the bill of exceptions, that he required us at the trial to specify the particular points of the charge to which we excepted. The authority to require this is denied. We contend that we had a right to except to the whole charge, and were not bound to specify the exceptions at the trial. The rules of this Court require the specifications of error to be made here, and not before. The authorities are to this effect. *Phœnix Ins. Co.* v. *Pratt*, (2 *Binn.* 308. 318. 321. 323.) It is settled, that this Court will take notice of an error not assigned, and even of a point not made in the Court below, if the justice of the case requires it. *Anderson* v. *Long*, (10 *Serg. & Rawle*, 55.) *Hoffner* v. *Wightman*, (5 *Watts*, 205.)

1. The 5th, 6th, 7th, 8th and 9th specifications of error relate to those parts of the charge of the learned judge which appeared to interfere with the province of the jury in weighing evidence and estimating the character of witnesses. The rules on this subject are well settled. It is also settled that a judge has no right to leave a question as a fact to the jury, if there is no evidence at all on the point. *Sampson* v. *Sampson*, (4 *Serg. & Rawle*, 333, &c.) *Dubois* v. *Lord*, (5 *Watts*, 47.) *M'Clurg* v. *Willard*, (5 *Watts*, 275.) *Newbaker* v. *Alrichs*, (5 *Watts*, 183.) *Fish* v. *Brown*, (5 *Watts*, 441.)

2. The remaining exceptions relate to the presumption of life or death in an absent person. This is a question of great interest, and perhaps it may considered an open one in this state. If the English rule has not been adopted here, it is worthy of consideration whether in so migratory a community as this is, it is entirely applicable. Before the passing of the statutes of 1 James 1, c. 11, s. 2, and 19 Charles 2, c. 6, the rule was, that when a man was once proved to be living, he was presumed in law to be still living, until the contrary was proved. The statutes of James and Charles have been

applied by the English Courts to cases not mentioned in them, that is, to raise a legal presumption of death after the lapse of seven years from the time the party was last heard of, after diligent inquiry. We contend, that the learned judge of the District Court made two mistakes, 1. In laying down as a rule, that at the end of seven years a person is presumed to be dead, if not heard of, although there is no proof of inquiry respecting him. 2. In telling the jury, that they might presume death *within* the seven years, from circumstances which are insufficient to create or raise a presumption. The English authorities —which are not numerous—do not seem to support these positions. In *Throgmorton* v. *Walton*, (2 *Roll. Rep.* 461,) it was laid down, that the proof of the fact of death lies on the party asserting it. So in *Wilson* v. *Hodges*, (2 *East*, 311.) In *Doe* v. *Jesson*, (6 *East*, 80,) it was said by Lord ELLENBOROUGH, that the presumption is of death at the end of the seven years. In *Richards* v. *Richards*, cited in a note to *Doe* v. *Griffin*, (15 *East*, 293,) it was ruled, that the plaintiff must remove all possibility of title in another person; and there it was held necessary to prove that the person absent died without issue. The case of *Doe* v. *Nepean*, (5 *Barn. & Ad.* 86, 27 *Eng. Com. Law Reps.* 42,) relied upon by the learned judge on the trial of this case, does not go the length supposed; and if the opinion of the Court is to be understood as supposed, it is contrary to the authorities, and the reason of the rule, which must mean that the presumption does not *begin* to run, until after the expiration of seven years. It is like the rule of age, which requires the twenty-one years to be fully completed, before the minor becomes an adult, and cannot dispense with an hour of the time. Such is the English rule, as to presumptions of life. The law of continental Europe on this subject will be found in 4th *Birge on the Conflict of Laws*, ch. 5, § 1. The presumption of the English law is an arbitrary one, independent of age, habits of life, &c. According to the best calculations of writers on the subject, the chance of life of Wm. J. Currie at the age and time at which he left home, was at the lowest twenty-one years. The mere circumstance of going to sea is not sufficient to interfere with the presumption of life. Nor was the circumstance of engaging in prohibited trade in South America; since that was not punished with death. It does not appear that the English rule of seven years has been expressly adopted in this state. In *Miller* v. *Beates*, (3 *Serg. & Rawle*, 490,) it was certainly not so understood, as is plain from the language of C. J. TILGHMAN. In *Innes* v. *Campbell*, (1 *Rawle*, 373,) C. J. GIBSON says, that, "in addition to the lapse of time, proof that a man has not been heard of for seven years is sufficient to rebut the presumption of life," and it was held that "the lapse of twenty-four years, without proof of inquiry, or other circumstances," is sufficient to rebut the presumption of life. The Pennsylvania cases then, certainly do not allow any presumption of the ceasing of life within seven years;

(Burr v. Sim.)

and it does not appear that any rule fixing that period has been adopted. In Massachusetts it has been expressly decided, that mere absence, for *less* than seven years, is not sufficient to create a presumption of death. *Newman* v. *Jenkins*, (10 *Pickering*, 515.) And the other American cases are consistent with this. *Woods* v. *Woods*, (2 *Bay*, 476.) *King* v. *Paddock*, (18 *Johns*. 141.) At all events, if circumstances are allowed to create a presumption of death within the seven years, they must be stronger and more to the purpose than any which were given in evidence in this case.

Mr. *J. M. Read* and Mr. *Bradford*, for the defendants in error.

1. The evidence in this case proved satisfactorily that William James Currie was a resident of Philadelphia; that he went on a voyage to the Spanish Main, and was never heard of afterwards. At the time of the trial forty-five years had elapsed from his departure, and no one pretended that he was seen in life after he sailed from New York. The defendants' witnesses, in proving his existence, proved also enough to raise the presumption of his death, a short time after his departure. Was it necessary for us, with such testimony, to prove inquiry after him? In fact, Dr. Currie's letter of 1813, sufficiently proved inquiry, and that by the proper person.

The cases decided in this state show, at all events, the readiness of the Court to adopt the English rule. In *Miller* v. *Beates*, C. J. TILGHMAN, decided only the point before him. In *Fulweiler* v. *Baugher*, (15 *Serg. & Rawle*, 65,) Judge HUSTON, speaks of the seven years presumption. In *Innes* v. *Campbell*, it is also alluded to. In *King* v. *Paddock*, only twelve years had elapsed at the time of trial. The English cases support the view taken by Judge STROUD. *Rowe* v. *Harland*, (1 *Wm. Blackst.* 404.) 2 *Starkie on Evid.* 457. 3*d Do.* 1120. In *Doe* v. *Jesson*, it was not necessary to the decision of the case to inquire if the person died within seven years. *Doe* v. *Deakin*, (4 *Barn. & Ald.* 433.) *Doe* v. *Griffin* (15 *East*, 293.) The case of *Doe* v. *Nepean*, is the latest English case, and express to the main point in this argument. In respect to other presumptions, as of a right of way, the law does not ascertain any precise time. There is no authority which says that a jury may not presume death within the seven years, from circumstances. The legal presumption is, that the person was dead at the end of seven years, not that he lived all the time. The rule violates common sense if it supposes that a man died exactly at the end of seven years. *Webster* v. *Birchman*, (13 *Ves.* 362.) In 3 *Kent's Commentaries*, 301, it is said that when a missing vessel shall be supposed to have perished, depends on circumstances. *Patterson* v. *Black*, (1 *Phillips on Ins.* 292; 2 *Marshall*, 781.) *Green* v. *Brown*, (2 *Strange*, 1199.) *Brown* v. *Nelson*, (1 *Caine's Rep.* 525.) *Gordon* v. *Bowne*, (3 *Johns. Rep.* 150.) *Horseman* v. *Thornton*, (1 *Holt N. P. Cas.* 242; S. C. 3 *Eng.*

(Burr *v.* Sim.)

*Com. Law Rep.* 88.)  *Watson* v. *King*, (1 *Starkie's Rep.* 121 ; S. C. 2 *Eng. Com. Law Rep.* 322.)  *Twemlow* v. *Osborn*, (2 *Campb.* 85.) In *Hopewell* v. *De Pinna*, (2 *Campb.* 113,) Lord ELLENBOROUGH, ruled that it was necessary for the defendant to show that her husband was living. In *Thorn* v. *Rolf*, (2 *Dyer*, 185,) it appears that there was an inquiry as to the seven years previous to the statutes. Under the statute of bigamy, the presumption is not that the absent person lived through the seven years. *King* v. *Twyning*, (2 *Barn. & Ald.* 385.)  In questions of survivorship it is a matter of evidence and circumstances. *Broughton* v. *Randall*, (*Cro. Eliz.* 203.)  *Taylor* v. *Diplock*, (2 *Phillimore*, 261 ; S. C. 1 *Eng. Eccl. Rep.* 259.) *Selwyn's Case*, (3 *Haggard*, 748 ; S. C. 5 *Eng. Eccl. Rep.* 254.) *Mason* v. *Mason*, (1 *Meriv.* 308.)  So with respect to other presumptions. *Norris* v. *Norris*, (1 *Finch's Ch. Cas.* 419.)  *Nichol* v. *M'Farlane*, (3 *Watts*, 165.)  *Rex* v. *Harborne*, (4 *Nev. & Man.* 343 ; S. C. 29 *Eng. Com. Law Rep.* 161.)  2 *Leigh's N. P.* 933.  It is impossible to avoid giving weight to circumstances, such as the age, health and pursuits of the person. Now, was there *any* evidence to go to the jury in this case, of any circumstances raising a presumption of death within seven years ?  Dr. Currie was executor of Mrs. Craig, and administrator of both her sons, and necessarily had all the papers and all the information on the subject. Mrs. Ross's testimony was very unsatisfactory. Mrs. Haly's will which was a formally drawn instrument, furnished very important testimony. On the 10th of February, 1792, she speaks of him as then absent beyond sea. The codicil seems to show that she considered him as then dead. Dr. Currie's will and declarations prove that he knew himself to possess only a life-estate in this house. His letters also furnish evidence against the view taken on the other side. Dr. Currie swore, on taking out letters of administration, that William J. Currie, was a mariner. He probably sailed from New York in the month of December, at a tempestuous season. It is a matter of history, that the yellow fever prevailed in the West Indies, in the neighbourhood of the Spanish Main, in the year 1793. These were circumstances sufficient to go to the jury on the presumption of death. The following cases also were cited on this point. *Holman* v. *Exton*, (*Carthew*, 246.)  *Burns* v. *Burns*, (1 *Bayley's Rep. So. Car.* 507.)  *Proctor* v. *M'Call*, (2 *Bayley's Rep.* 298.)

2. The exceptions to the charge of the judge on matters of fact are not sustained. In 1*st Starkie* 73-4 (ed. 1828,) it is said that in questions of presumption it is the duty of the Court " to analyse the evidence, to extract and propound the particular points to which the attention of the jury is to be directed, and to comment upon the bearings, tendency, and force, of the particular facts, and to observe upon the comparative weight and force of conflicting evidence." And the authorities show that this position is sound. *Rex* v. *Higgins*, (3 *Carr. & Payne*, 603 ; S. C. 14 *Eng. Com. Law Reps.* 476.)  *Rex*

(Burr *v.* Sim.)

v. *Clewes,* (4 *Carr. & Payne,* 221 ; S. C. 19 *Eng. Com. Law Rep.* 354.) *Smith* v. *Blandy,* (*Ryan & Mood.* 257 ; S. C. 21 *Eng. Com. Law Rep.* 433.) *Delany* v. *Robinson,* (2 *Wharton's Rep.* 503. 506.) *Baker* v. *Lewis,* (4 *Rawle,* 356.) *Kellog* v. *Richards,* (14 *Wend.* 116.) *U. S.* v. *Packages,* (*Gilpin,* 254.) *Exparte Crane,* (5 *Peters,* 198.) *Scott* v. *Lloyd,* (9 *Peters,* 442.) *Magniac* v. *Thompson,* (7 *Peters,* 390.) *Carver* v. *Jackson,* (4 *Peters,* 2.) *Whitehill* v. *Wilson,* (3 *Penn. Rep.* 405.) *Stouffer* v. *Latshaw,* (2 *Watts,* 167.) *Hanney* v. *Stewart,* (6 *Watts,* 487.) *Evans* v. *Mengell,* (6 *Watts,* 74.)

Mr. *Rawle,* in reply.

I presume that it is not necessary to say any thing upon the subject of the judge requiring us to specify our exceptions to the charge. [KENNEDY, J.—There has been no answer on the part of the defendants in error to this point; and you need not press it.]

The great error in the learned judge below, was in leaving to the jury to *infer* from the evidence, that W. J. Currie went away from Philadelphia previously to 1790. There was not a word of evidence to this effect, and the only possible ground for inference was to be found in the will of Mrs. Haly, who in February, 1792, speaks of him as then absent. Now, he was absent at a previous time, and as it appeared that he returned and went to sea again, this passage in the will may have alluded to his first voyage. Whether the English rule as to the seven years' presumption exists at all here has been doubted. But supposing it to have been adopted as fully as it exists in England, it does not sanction the charge excepted to. The rule is not that there is a presumption at the end of seven years, that death *has* taken place, but that there is a cessation of life at the end of that period. The distinction is important, and well founded in reason and authority. How then can life be presumed to have ceased within that term ? The case of *Doe* v. *Nepean* is inconsistent with all the previous law, and of no authority. Suppose A. C. Craig had died in a week after W. J. Currie sailed, on the doctrine of the learned judge, the jury might presume the death of the latter to have been previous to that of the former. The Court might as well have told the jury, that they had a right to presume payment of a bond within twenty years, from the mere circumstance of no demand having been made, whatever might be the situation of the parties. The cases respecting the loss of vessels are not analogous. In the one case it is an artificial presumption of law. In the other it is a presumption of fact. It was incumbent on the plaintiffs to prove that the vessel had foundered at sea, or never been heard of, if they relied upon W. J. Currie's perishing on the outward voyage. The case of *Newman* v. *Jenkins,* (10 *Pickering,* 515,) is conclusive as the decision of a highly respectable Court. The circumstances relied upon on the other side really amount to nothing. It is true

that Dr. Currie called him a *mariner*, in the administration papers, but it is evident that such was not his vocation; and if it were, it would not greatly diminish the chances of life. There is no evidence or knowledge of the yellow fever having prevailed in 1793, or any other year, on the Spanish Main. The correspondence between Dr. Currie and the attorneys of the plaintiff, and the accounts of Mr. Ralston, furnish almost irresistible evidence that W. J. Currie, did not die on the outward voyage, or shortly after his arrival in Spanish America; since if such had been the case, information of the fact would have been received, and the plaintiffs would certainly have not agreed to the compromise which was made, and the division of the personal property.

The opinion of the Court was delivered by

GIBSON, C. J.—Not only convenience but necessity calls for a definite rule to produce certainty of result in the determination of facts which must be passed upon without proof; and such can be obtained only from the doctrine of presumptions, which, however arbitrary, is indispensable, and, when founded in the ordinary course of events, productive of results which usually accord with the truth. There is nothing so frequently unattended with the ordinary means of proof, and yet so essential to the determination of a right, as the time of an individual's death. The common law soon had recourse to presumption for the continuance of life, by casting the proof of its cessation on him who alleged it; yet it must have been obvious that a counter-presumption of superior power, founded in experience of the ordinary duration of human existence, and leading to a certain conclusion of death, might be raised from lapse of time alone. The latter, however, would be but a natural presumption, producing, not constructive belief but actual conviction; and failing to apply its rule to cases without regard to circumstances, it would be inadequate to the necessities of legal adjudication. Sensible of this, the English judges provided for these necessities by limiting, in analogy to their statutes concerning leases and bigamy, the presumption of life to the period of seven years. These statutes are not in force here, nor have we any of our own which correspond to them: consequently the period assumed with us, must be an arbitrary one, just as is the period for the presumption of payment, which corresponds with the English statute of limitations, to bar an entry, instead of our own. The period assumed by the English judges, however, is a reasonable one, and we have been cautiously but constantly approaching it. That it had not already been arrived it, as in some of our sister states, by direct decision, is to be ascribed to the absence of a case which required it. Such a case now occurs; and the principle is to be considered as definitively settled.

But the presumption of death, as a limitation of the presumption of life, must be taken to run exclusively from the termination of the

(Burr v. Sim.)

prescribed period; so that the person must be taken to have then been dead and not before. Indeed that is a necessary conclusion from viewing it, not merely as a limitation, but as a countervaling presumption, which, as it does not supplant its predecessor before the end of the period, assumes no more than that the individual and the period expired together; and the predecessor being still in force to rule the case in respect to the time covered by it, is sufficient to sustain an inference of intermediate existence throughout. Thus the presumption of life continues till it is displaced by a more potent one, which, however, has no retroactive force; and indeed it would be of little use if it had, for to leave the time of the death still uncertain, would leave a perplexity which it was its purpose to remove. It is undoubtedly true that additional circumstances of probability, may justify a presumption that the death was still sooner; but these, where they operate, introduce a distinct and dissimilar principle. What seems to me to be a palpable error of Chief Justice DENMAN, in *Knight* v. *Nepean*, on the authority of which the present case was ruled below, is the view he took of the presumption of death from the efflux of a definite period, as being, in some measure, a *natural one* operating *within* the period and in proportion to its tendency to produce actual belief, and not merely as an artificial one tending to the legal conclusion of a fact *without* the period, which independently of circumstances, a jury is bound to draw. A similar want of attention to its class, produced those loose and indeterminate dicta in regard to the presumption of payment from lapse of time, which were noticed in *Henderson* v. *Lewis*, (9 *Serg. & Rawle*, 384.) It certainly has not been expressly decided that the person must be taken to have lived throughout the period; but that conclusion inevitably follows from the legal presumption of life, which though prospectively rebutted at a particular period, is sufficient to sustain the allegation of existence during the time it lasted. On the other hand, there is no precedent to the contrary; for the presumption in *Watson* v. *King*, which grew out of the probable fate of a missing ship, rested on circumstances very different from those which are usually connected with the probable fate of an absent individual. In the case at bar therefore, we must say there was an error in leaving the jury to presume the death to have been at an intermediate period, unless we discover in the case at least a spark of evidence that the individual was, at some particular date, in contact with a specific peril as a circumstance to quicken the operation of time. The circumstance relied on, is the departure of the individual by sea; but the perils of the sea are general, not specific; and they are not present but contingent. They are such as may or may not occur; but to accelerate the presumption from time, or more properly to turn it from an artificial into a natural one, it is necessary to bring the person within the range of a particular and an immediate danger —not such as is contingently incident, in some degree, to every

(Burr *v.* Sim.)

mode of conveyance. A natural presumption arises only from a violent probability, because it is a conclusion drawn by experience from the usual current of things; but no violent probability of death arises from a peril, which, though possible, is remote. All the examples put by the judge himself, are those of special perils which bear directly on the person with greater or less probability of its destruction in proportion to their urgency; and such was the nature of the probability in *Watson* v. *King.* Now there is no mode of conveyance which has not its perils; and if the mere departure of a person not heard of during the period of legal presumption, were enough to warrant a natural presumption of his death within a more contracted one, the legal presumption, stript of its efficiency to dispose of the uncertainty it was introduced to remedy, would be deprived of the greater part of its value. We are of opinion, therefore, that though the exceptions to other parts of charge are not legitimate subjects of revision here, the direction that there was evidence from which the jury might infer the death to have been at a time short of the period of legal presumption, was erroneous.

Judgment reversed and a *venire de novo* awarded.