## Meadville Production Credit Assn. v. Haskell

*David S. Gifford,* for plaintiff.

*Gunnison, Fish, Gifford & Chapin* and *Reed & Spofford,* for defendant and intervenor.

BARNETT, P. J., forty-first judicial district, specially presiding, December 11, 1939.—These are rules to open judgment and stay execution. The facts below recited are taken from an agreed statement of facts filed by counsel and from testimony supplemental thereto.

The Meadville Production Credit Association, plaintiff, is a coöperative bank, organized under the Farm Credit Act of June 16, 1933, 48 Stat. at L. 257. Its purpose is to make loans to farmers. Its place of business is Meadville, Pa.

On March 11, 1938, plaintiff entered in the Court of Common Pleas of Erie County, to no. 87, D. S. B., February term, 1938, a judgment against Seth A. Haskell, a resident of said county, in the sum of $1,310.50, upon a note with warrant of attorney to confess judgment. The note is dated April 27, 1937, for $1,200, with interest at five percent, payable to plaintiff in two instalments, the last falling due December 1, 1937. Nothing was paid on account of interest or principal. The note recites that it "is secured by a chattel mortgage of Seth A. Haskell to the Meadville, PCA, dated 4/27/37".

Subsequently the following judgments were entered against Haskell:

| Entered. | Favor. | No. and Term. | Amount |
|---|---|---|---|
| 5/4/38 | T. W. Spofford. | 256, Feb. D.S.B., 1938 | $157.50 |
| 5/5/38 | R. H. Hubbell. | 261, do. | 315.00 |
| 5/6/38 | Bank of Erie. | 264, do. | 294.00 |
| 5/7/38 | First Nat. Bank of Erie. | 278, do. | 210.00 |

On May 9, 1938, plaintiff issued a writ of fieri facias upon its judgment and personal property of defendant,

consisting of livestock and farming implements, was levied on by the sheriff and advertised to be sold May 18, 1938.

On May 17, 1938, Thomas W. Spofford, plaintiff in one of the judgments above noted, petitioned the court for a rule to show cause why the production association's judgment should not be opened and all proceedings stayed. The rule was granted and the sale advertised for May 18th was stayed until July 7, 1938.

On June 30, 1938, the First National Bank of Erie, another judgment creditor, obtained a rule to open the same judgment and stay further proceedings.

In the meantime the tax collector of North East Township and the County Treasurer of Erie County filed with the sheriff claims for taxes for the years 1934 to 1938, inclusive, and demanded payment out of the proceeds of the sale of defendant's personal property.

While the stay of the first writ of fieri facias continued, the court, by order granted September 21, 1938, permitted the sale as perishable property of the grape crop on defendant's farm in North East Township, which had been levied on by virtue of an alias writ, the proceeds of the sale to be held by the sheriff pending determination by the court of the party or parties entitled thereto. The grape crop was sold, for a price not disclosed by the record, which price was apparently the only money so far realized upon either of the two writs.

In each of the two petitions to open the judgment and stay the writ the chief reason assigned is that defendant must, in the light of certain facts, be presumed to have died on or about May 2, 1938, a week before the execution was issued. The facts upon which it is argued such presumption must arise are the following: Defendant lived with his wife and a 17-year-old daughter upon a 66-acre farm in North East Township, Erie County. The farm was devised to him in 1924 by his father. Whether the devise vested in him a fee or merely a life estate need not now be decided. His occupation for two years pre-

ceding his disappearance was the sale of electric light bulbs as agent for the manufacturer. It was his practice to drive alone in his automobile over the Counties of Erie and Crawford in search of business, returning to his home regularly every evening at about five o'clock, never remaining away at night. His domestic life was apparently happy, but he told his wife little of his business and financial affairs. He was deeply in debt, owing a balance of $2,200 on a mortgage on his farm, in addition to the several judgments above noted, and having borrowed extensively from friends and acquaintances. Three years before he had borrowed to the limit on his life insurance policies and had allowed them to lapse. He was not known to be a gambler and, upon investigation made after receipt of the letter below quoted, no evidence was found that he had been losing money in the stock market. He was of temperate habits and enjoyed the respect of the community in which he lived. One evening about a week before May 2, 1938, he read to his wife a newspaper report of a salesman's suicide by going over Niagara Falls, and remarked, "Here is an easy way to go." To his wife's comment that "a man would be a coward to do that", he replied, "Sometimes that is the only way out."

At about 8:15 o'clock on the morning of May 2, 1938, he left home in his car apparently for his daily business trip. There was nothing remarkable in his manner at the time, except that he displayed unusual emotion in taking leave of his wife. He did not return that night and has not been seen since. The following morning the mailman handed to Mrs. Haskell two envelopes postmarked "Niagara Falls, May 2, 1938, 5:30 p.m.". One envelope contained a garage parking ticket for his automobile and 26 cents in coins. In the other was a postcard upon which was written the following message:

"Mother and Nancy: Just found out at Polk the lights were not a licensed lamp. This means the end for me. I have played the stock market and lost—borrowed from everyone to pay the other back, but with no luck. It is

terrible I know for you and Nancy, as I did and do love you both as no one could. Enclosed find check for car and 26¢ in money. This is all I have in the world. God bless you both, and I ask forgiveness as my body will not disgrace the Haskell lot."

In the afternoon of May 3rd, Ellwood Miller, Mrs. Haskell's brother-in-law, found Haskell's car in a garage located about two blocks from the falls and brought it to the Haskell farm. He learned that the car had been left at the garage at 2:30 p.m., May 2d, by a man answering the description he gave of Haskell. He described Haskell also to a man and his son who make a business of dragging the Niagara River below the falls and watching for bodies of persons who may have been drowned in it. Two weeks later he returned to Niagara Falls and inquired of the garage man and the two river men but learned nothing more respecting Haskell. No further search or inquiry for Haskell or his body has been made.

Upon the record of which the foregoing is the substance we are asked to announce certain conclusions of law.

1. Were the circumstances under which defendant disappeared on May 2, 1938, sufficient to raise a presumption of death on or after that date?

The Act of April 27, 1927, P. L. 425, amending the Fiduciaries Act of June 7, 1917, P. L. 447, does not provide an exclusive procedure for determining whether death of an individual is to be presumed from unexplained absence.

"The courts have frequently, since the passage of the Act of 1885 [supplied by the Act of 1927], assumed jurisdiction to pass on the question of presumption of death without the formality of applying for letters of administration pursuant to that act": Maley, Executrix, v. Pa. R. R. Co., 258 Pa. 73, 78; Groner v. Knights of Maccabees, etc., 265 Pa. 129, 135. In the latter case it is held that "the common law rules upon that point are still applicable to cases, arising in the common pleas, involving the question of presumption of death."

The English rule that in the case of an absent person, of whom no tidings are received, the presumption of the continuance of life ceases at the end of seven years, was first definitely adopted in Pennsylvania in the case of Burr v. Sim et al., 4 Whart. 150. As Chief Justice Gibson there interprets the rule (p. 170) :

". . . the presumption of death, as a limitation of the presumption of life, must be taken to run exclusively from the termination of the prescribed period; so that the person must be taken to have then been dead and not before."

"Burr v. Sim, supra, and subsequent cases, in the same line, have established a rule of property in this state which cannot be changed by us without disastrous consequences. Irrespective of that, however, it is more than doubtful whether any change or modification of the rule would be at all desirable": In re Petition of Mutual Benefit Company, etc., 174 Pa. 1, 10.

We have been referred to or have found no case up to the present time in which this firmly-established rule has been departed from. It is true there may be circumstances to justify the presumption that death occurred less than seven years after the disappearance, as where the absentee, when last heard from, was immediately exposed to some specific peril. In Burr v. Sim, supra, the chief justice, commenting on this possibility, said (p. 171) :

". . . to accelerate the presumption from time, or more properly to turn it from an artificial into a natural one, it is necessary to bring the person within the range of a particular and an immediate danger."

Exposure to a specific peril does not of itself create the presumption of death. It is only when that presumption has ripened through the lapse of seven years that evidence of such exposure may have the effect of moving the date of the presumed death back from the end of the seven-year period to the date of the exposure. See Fanning, Admx., v. The Equitable Life Assurance Society, 264 Pa. 333, 341.

Less than two years have elapsed since Haskell was last seen alive. The only fact relied upon to except the case from the ordinary rule requiring an unexplained absence of seven years to raise the presumption of death is his letter to Mrs. Haskell, mailed at Niagara Falls the evening of the day he left his home. The letter seems to indicate an intention to commit suicide. There is not the least evidence that he did so. Whether he actually took his life, whether he lost courage before taking the fatal plunge, whether the message was a mere cover for escape from an environment which had become intolerable to him because of his business failure and his debts, are at present mere conjectures. If he is not heard from for seven years from the date of his departure, the presumption of his death will arise. Even then his letter alone would be insufficient to change the "artificial" presumption of his demise at the end of that period to the "natural" one of self-inflicted death on May 2, 1938. He was on that date exposed to no specific peril, no "particular or immediate danger". He had apparently the free choice of life, or death by his own act, and we have no means of knowing which he may have decided. We must answer this request in the negative.

2. The second question is postulated upon a presumption of death on May 2, 1938, and since we have found there was no such presumption the question requires no discussion.

3. Does the fact that the tax collector of North East Township has filed with the sheriff a claim for 1938 taxes, and the county treasurer has also filed a claim for 1934, 1935, 1936, and 1937 taxes, entitle either or both to a prior claim on the proceeds of the execution? In any event, how should the funds in the sheriff's hands be distributed?

We have been referred to no authority, and we know of none, holding that a lien for taxes may be acquired on personal property in any manner other than that provided by successive statutes, the last of which is the Act of May 4, 1927, P. L. 712, sec. 1, which is by the collector's levy

and distress. In these instances no distraint or levy was made by the collector or the county treasurer. Even if the notices of claim for the taxes, served on the sheriff, could be held to be the equivalent of distraint and levy, those notices came subsequent to the sheriff's levy which therefore had priority over them. The sheriff's levy created the first lien upon the property sold, i. e., the grape crop, and upon other personal property as yet unsold. See Helsel & Baird v. Walker, 7 Dist. R. 628, and cases there cited. It follows that any sums already realized or hereafter to be realized from the sale of property thus sold or to be sold should be first applied by the sheriff to the satisfaction of the writs in his hands.

4. May plaintiff claim a lien on defendant's personal property by reason of execution on judgment entered by confession on March 11, 1938, independently of, and without reference to, the chattel mortgage executed as security for the bond on which judgment was taken?

The note or bond is the primary evidence of defendant's debt to plaintiff. It recites that it "is secured" by the chattel mortgage. The mortgage does not purport to limit in any way plaintiff's remedy, provided by the confession of judgment contained in the bond. Plaintiff's lien and right to execution was acquired by entry of judgment on the bond. Neither the judgment, nor the process provided by law for its collection, is qualified or limited by the existence of the additional security provided by the mortgage. The writ of fieri facias was issued on the judgment and may be proceeded with as if the mortgage did not exist.

5. If plaintiff's lien against defendant's personal property is dependent upon the chattel mortgage executed as security for the bond on which judgment was entered, is such lien valid or invalid because of the constitutionality or unconstitutionality of the Chattel Mortgage Act of March 2, 1933, P. L. 6, as amended by the Act of April 18, 1935, P. L. 38?

153

In view of our conclusion upon the preceding question, it is unnecessary to consider this one.

And now, December 11, 1939, the rules to open judgment and stay execution are dismissed; the sheriff is directed to apply the funds realized from the sale of the grape crop to the satisfaction of the writs in his hands; and is further directed to proceed with the sale of other personalty levied on until such writs shall have been fully satisfied. Exceptions allowed petitioners.