# JOHN HAMILTON *vs.* THE ANNAPOLIS AND ELK RIDGE RAIL ROAD COMPANY.

The rail road company erected, on a part of the land which belonged to the complainant, (Hamilton,) and which the company had caused to be condemned for a rail road, a house for the accommodation of passengers waiting the arrival of cars. This gives the complainant no title to relief in chancery. A building, at the place of junction of this with the Baltimore and Washington rail road, for the accommodation of passengers while detained there, is to be regarded, not only as a convenience, but as indispensably necessary.

A second inquisition to condemn more land was obtained in this case; returned to the county court and confirmed. After the decree of the chancellor, the damages assessed by said inquisition were received by the complainant; of this second appropriation of land for the use of the company, if wanted for the road, the complainant has no such cause to complain.

There is no appeal from the decision of the county court ratifying the proceedings in such a case. There alone the inquisition can be resisted.

The house cannot be claimed by the complainant, because of its being sometimes used as a tavern or store. If any individual sustains special damages by any illegal act of the company, courts will grant him redress for the past, and if it be necessary, will prevent the repetition of similar acts.

THIS case comes by appeal from the High Court of Chancery.

The bill was filed by the appellant on the 23rd July, 1846, and in it the complainant claimed the money, which, in 1838, it was awarded that the company should pay to him for land of the complainant, which the company had cause to be condemned for its road. The complainant also claimed the possession of a tavern and dwelling house, which the company had erected on the lands thus condemned.

The first condemnation bore date 12th May 1838, in virtue of a warrant by a magistrate, which stated that it was issued, because the parties could not agree for the land, gravel, &c., which was wanted for the construction of the road. The second warrant was issued 18th June 1838, and the same reason was assigned for the issuing of that. These inquisitions were confirmed by Anne Arundel county court, and it is charged that the company has entered on the lands con-

70      v.1.

demned ; but has failed to pay to the complainant the damages assessed to him as aforesaid.

The bill also charges that some of the land condemned, was not absolutely necessary for the purposes of the company, that the company rents the house, and thereby that part of the land is forfeited.

The bill prays, besides the general prayer, payment of the damages assessed by the juries, and that the company may be decreed to surrender up to the plaintiff the possession of the land so occupied as a tavern, and which is not necessary for the purposes of the company.

The answer having stated that the defendant had conveyed all its property and effects to certain trustees, for certain purposes, the bill was amended by making those trustees parties, who also answered.

The answer discloses the grounds of defence. The condemnation spoken of in the bill, and the assessments of damages, are therein admitted, and also the non-payment of the damages. It insists that these condemnations were made for the legitimate purposes of the road, and that the inquisitions made as stated, and ratified by the county court, must be conclusive on the subject. There is an admission that a part of the land is not in actual use at this time, but that it cannot be separated from the residue without great inconvenience to the company. This is not used because the Baltimore and Ohio rail road company refused to allow the connection of the spur contemplated.

It also admits that a small house has been erected on the land condemned for the accommodation of passengers over the road ; that the tenant has an ordinary license, but he pays no rent and the company has no interest in the business, and no improper use is made of it.

The chancellor was of opinion that the plaintiff could not question the propriety of the condemnations, after the inquisitions had been so long confirmed.

On the fourth day of March 1848, he passed a decree directing the payment of the damages assessed. These were

paid to the plaintiff's solicitor, who, by an order filed 3rd March 1848, directed the register to enter the decree *satisfied*, and then on the 20th May 1848, he entered an appeal from said decree.

A commission was issued, and witnesses who were examined, testified as to the size of the house erected, and that it would rent for $150 per annum; that goods are never stored there, and that the house is only used by the company for the convenience of passengers who are waiting for cars on a distinct rail road; that there is a garden to the house which has been used for a store and tavern.

A witness, while tenant there, paid $96 for repairs, and occasionally attended the switch. There is also an admission that the house was used as a tavern.

This case was argued before all the Judges.

By *Parran* and *Brent* on the part of the appellant, and *Shaaff Stockett* and *Alexander* for the appellee.

*Parran* for the appellant.

This company was incorporated by the act of 1836, ch. 298, the fifth section of which confers on it all the powers which its charter confers on the Baltimore and Ohio company, by several of its sections. Was it necessary to condemn all the property which it did condemn at the junction? Has it not forfeited all title to the same? 6 *Barr.*, *p.* 75, decides that such a building is not necessary to such a work. See also 15 *John.*, 358, *People vs. Utica*, and 8 *John.*, 422, *Jackson against Hartwell.* Corporation cannot be seized in trust for purposes foreign to its creation. 1 *Wend.*, 474. 14 *Wend.*, 54.

Title remains in the owner. 2 *John. Rep.*, 357. 15 *John.*, 447. 12 *Wend.*, 371, 98. 16 *John.*, 483. 6 *Mass.*, 456. 1 *Burr.*, 143 2 *Strange*, 1003. 2 *Mass.*, 127. 17 *Ohio*, 350. 1 *Conn.*, 131. *Ba. Ab.*, "*Highway*," (*B.*)

Has chancery jurisdiction? It has jurisdiction to compel

the payment of the condemnation money. 9 *How.*, 465. Trespass against an insolvent defendant would have been useless. Ejectment could not be brought, because the franchises of the company still existed.

*Shaaff Stockett*, for the appellee.

The appellant has received the condemnation money, and directed the case to be entered satisfied. 1 *How.*, (*S. C.*,) 182. 7 *H. & J.*, 256. 1 *Bland*, 19.

After confirmation of the inquisition, the chancery court has no jurisdiction. He relied upon the acquiescence for such a length of time. Inquisition in 1838, confirmed the same year, and this bill was not filed until 1846. Here was too great a length of time, and there were also large expenditures. See 2 *Story's Equity*, sec. 1520.

An act of incorporation like that of the Baltimore and Ohio rail road company, gives to the county court the sole control of the assessment. 8 *G. & J.*, 443, read from 448.

It is not shown that the land was improperly condemned. He referred to 14th and 17th secs., to show that the court had the power to erect the house. It is a necessary building, and in regard to such provisions, a liberal construction is given to these acts. 9 *G. & J.*, 479.

Even if there was an improper appropriation, for this there can be no forfeiture. How must the application be made? mis-user?—non-user?

A forfeiture cannot be taken advantage of collaterally. The mode is by *scire facias* or *quo warranto*. 3 *D. & E.*, 132. 4 *G. & J.*, 122. 5 *John. Ch'y Rep.*, 378. 2 *John. Ch'y Rep.*, 389, 390.

*Alexander.* From a decree which is entered satisfied, there can be no appeal. The case in 7 *How.*, 173, relied on by the appellant's counsel, presented quite a different question. Where a defendant has been compelled to perform the decree, he may it is true, sue out a writ of error. Here the complainant executed the decree. Can he then appeal? 4 *Com.*

*Dig.*, 256, (245 at the bottom of the page,) "*Execution,*" *(J, 3.)* 3 *Atk. Rep.*, 627.

The decree is, that he should take so much money in lieu of his land; he takes it for his title to the land, which is thereby vested in the defendant. He cannot get the land after he has demanded and received the purchase money.

It is not necessary for the corporation to cover every inch of the land condemned. The answer says that all the land condemned is necessary. The inquisitions were confirmed, and no appeal from the order of confirmation, is allowed to the Court of Appeals. What is this in this view of the case, but an appeal to the chancellor from the judgment of the county court?

The complainant had a right to go into the county court and object to the inquisition, on the ground that some of the land condemned was not necessary, as well as upon any other ground; but he suffers the inquisition of the jury to be confirmed, receives the money which was awarded to him in satisfaction of all the land condemned, and then would rescind or modify the order of confirmation.

The expenses incurred during such a length of time, are more than the land was worth. He remains silent all this time, and until the expenses are incurred. 6 *G. & J.*, 379.

It is said an improper use was made of the land. That is nothing to the complainant, after he has received the value of his land. The State may restrain the company in this respect, or it may waive its right, and no body else can complain of it. But the company has made no improper use of the land. 22 *Eng. C. L. Rep.*, 469.

*Brent* in reply.

The bill prays: 1st. The payment of the condemnation money. 2nd. That the land may be restored to the appellant. The condemnation does not take from the owner the title to the land. If the property is derelect, the original owner gains it.

This company has power to do every thing that is necessa-

ry for the construction and repair of the road, but not to build a house in which a tavern is to be kept, and a store also.

If this decree is reversed, the complainant, in addition to the money, is to have the house which is forfeited to him. An enumeration of certain powers, is a denial of others. There is no express grant of power to build a house, such a house is not necessary to the proper business of this company. 8 *G. & J.*, 249. The power claimed must be necessary, directly or indirectly, to the purposes for which this company is created. 15 *John. Rep.*, 383. Must be expressly granted, or necessary to the powers expressly granted.

The complainant is the owner of the property subject to the easement; and he objects to the use of a house, not while it is used for the accommodation of passengers, but as a tavern or store. 2 *John. Rep.*, 357. 15 *John.*, 447. 12 *Wend.*, 98. For every purpose except the servitude of the road, the soil belongs to the original owner. A right of way is an incorporeal hereditament.

1 *Con. Rep.*, 131, 139, 136, 143. 6 *Peters*, 513.

The company may exercise any powers necessary for the construction of the road, but cannot, by virtue of this grant, claim other powers by which the profits of the road may be increased. *Angel on Corporations, p.* 28.

According to the facts of the case, there is an abuse of corporate power. Has not chancery the power to injoin? See 2 *John. Ch. Rep.*, 162, 463.

The inquisitions, it is said, are conclusive. Only to condemn a certain quantity of land, not to exceed sixty-six feet; if they condemn more, the condemnation is a nullity.

The company has made two branches. Power is given to it, to make a rail road to a point of the Baltimore and Ohio rail road, and it makes two rail roads to two different points of the other road.

With regard to the house, it is a tavern, used as such, and it is asked that this be delivered to the complainant.

There is a general prayer, and under it the complainant

may claim any specific relief, to which the *allegata et probata* entitle him—any relief not inconsistent with the case in the bill. 6 *Peters*, 536.

When chancery gets jurisdiction for one purpose, it may give full relief. 9 *How.* 405.

ECCLESTON, J., delivered the opinion of the court.

The court decline expressing any opinion in regard to the motion to dismiss this appeal because they think the complainant is not entitled to the relief asked for by him, even if the decision upon this motion, should be against the appellee.

The two sums assessed by the juries as damages, to be paid by the appellees to the complainant, with the interest thereon, having been fully paid, in obedience to the decree of the chancellor, and satisfaction having been entered for the same, as appears by the record, there is no longer any controversy between the parties in relation to the damages so assessed.

The questions remaining for our consideration, are:

1st. Whether the complainant is entitled to the house claimed by him, which the appellees erected at the junction of their road with the Baltimore and Washington rail road?

2ndly. If the complainant is not entitled to the said house; then, whether he has a right to an injunction to restrain or prevent the using of that house as a tavern?

On the first question, to sustain the complainant's right to the house, it has been contended that it had never been used as a warehouse for the storage of goods or articles intended for transportation; that there was no necessity for such a warehouse or depot at that place; and the only use made of the building in connection with the rail road, was, for passengers occasionally to pass through or remain in. That the charter did not authorise the erection of a building for the convenience or protection of passengers simply.

The act of 1836, ch. 298, is that which incorporates this company; and the 5th sec., makes the act of 1826, ch. 123, from the 14th to the 23d section, inclusive, a part of the charter of the company.

We have been referred particularly to the 14th section of 1826, ch. 123, for the purpose of showing that the appellees had a right to condemn land, on which to build warehouses and other works, necessary for the construction and repair of the road, but not to erect a house or houses for the protection or convenience of passengers. This section gives the company the right to "enter upon and use, and excavate any land which may be wanted for the site of said road, or the erection of warehouses or other works necessary to said road, or for other purposes necessary or useful in the construction or repair of said road or its works." It is insisted that a correct interpretation of this language will not authorise the erection of a building for the use of passengers only. Such a building is not included in the expression of "warehouses or other works necessary to said road, or for other purposes necessary or useful in the construction or repair of said road or its works." We need not stop to enquire, whether this view of the section here alluded to, be correct or not. This fourteenth section is not the only one which contains a grant of power to the company on this subject. The seventeenth section of the same act is equally a part of the charter. And here the company are expressly authorised "to have, use or occupy any lands, materials or other property in order to the construction or repair of any part of said road or roads, or their works or necessary buildings." The important enquiry, therefore, is, whether the house in controversy, is a *building necessary* to the construction of the rail road. By the constructions of the road, we wish to be understood as meaning to include its existence as a road, with all its essential appurtenances. It stands at the terminus of the road, at its junction with the Baltimore and Washington rail road.

Persons from the surrounding country, some having a short distance to travel, others many miles, in their own vehicles, over common roads, intending to take the cars for Annapolis, cannot be expected at all seasons of the year, whether the roads are in bad or good order, to arrive precisely when the cars are ready to start. Although the hour of starting may

be published and generally known, accidents or special circumstances of some kind, may, and often will, occasion unavoidable delay. A change in the hour of leaving, will sometimes render it necessary for persons to wait at the junction. Nor can it be expected that the trains from Baltimore and Washington will be so arranged as to arrive just in time for the passengers to pass immediately from them to the cars, in readiness, to go at once to Annapolis. Under such circumstances, it is not only a convenience, but indispensably necessary to have a building at such a point, for the protection of travellers from exposure to bad weather. And therefore, clearly within the language of the seventeenth section, which provides for *necessary buildings.* We cannot subscribe to the doctrine that such a house at this place is less a matter of absolute necessity, than a warehouse for the storage of goods, or a depot in which to preserve the cars from exposure to the weather, at any point on the road; and it has been conceded on the part of the appellant, that under the charter, the company have the right to build a warehouse or a depot.

It has been said in argument that this is a private corporation. And authorities have been referred to for the purpose of establishing the position, that the company can claim no "rights except such as are specially granted, and those that are necessary to carry into effect the powers granted; and that all grants of authority to them must be strictly construed." It is not perceived that these principles are at all impugned by deciding that the company were authorised to erect the building now in dispute. The charter, in express terms, having given the right to construct *necessary buildings,* the only question to be settled is, whether a house is necessary, not convenient merely, but absolutely necessary for the protection of passengers from inclement weather, at the *Junction,* as it is usually called. Of which necessity, we entertain no doubt.

The case of *Rail Road vs. Berks county,* 6 *Barr.,* 70, was much relied upon for the purpose of sustaining the position, that the house in controversy, is not one of those necessary

buildings which is provided for by the 17th sec. of 1826, ch. 123. The main question in the case referred to, was designed to ascertain what species of property owned by the rail road company, was subject to taxation. It is well known that in such controversies, the courts are strongly disposed to favor the pretensions of the State; and it is not to be supposed that they will release from taxation, any property which is not clearly exempt by law. And yet on this occasion, an office used for the sale of passenger-tickets, and for the accommodation of passengers, was held not liable to assessment. On page 73, the court of common pleas declared, that the workshop in South-East Ward is liable to taxation, but that the passenger depot is not. That so much of the property in North-East Ward as is occupied for the purposes of a freight depot, wood and coal-yard, coal-shutes and an oil office, is not subject to assessment. And that the depot in Centre Township, and the water stations in Upper Bern, are not liable to taxation.

On page 75, the Supreme court say: "The judge was right in determining that the water stations and depots of the rail road were not taxable. We understand depots so exempt from taxation, as the offices, the oil houses, and places to hold cars, and such buildings and places as may fairly be deemed necessary and indispensable to the construction of the road. Warehouses, coal-lots, coal-shutes, machine shops, wood-yards and such places, form no part of the construction of the road. They are only indispensable to the profits to be made by the company, and are legitimate subjects of taxation within the act of 1844. They are not appertinent to the road, but to the business done upon it. So far then, as this opinion changes the opinion of the common pleas, on the case stated, the judgment is reversed, but no further."

Thus it appears that the Supreme court affirm the decision of the court below in exempting the office or depot for the accommodation of passengers. And this exemption is based upon the ground that it is appertinent and indispensable to the road. That we are right in this view of the decision,

must be evident from an attentive examination of the case as reported.

In the statement of facts set forth on page 70, part of the property in South-East Ward is said to be occupied "for an office for the sale of passenger tickets, and for the accommodation of the passengers." Judge Jones, of the common pleas, when speaking of this same property, says: "And the passenger depot, which is not liable to taxation." After assenting to the decision below, which exempts "water stations and depots," Judge Burnside, in delivering the opinion of the appellate court, proceeds to say: "We understand depots so exempted from taxation, as the offices, the oil houses and places to hold cars, and such buildings and places as may fairly be deemed necessary and indispensable to the construction of the road." In the words *depots* and *offices* here used, certainly is included the building which, in the statement of facts, is called "an office for the sale of passenger tickets, and for the accommodation of the passengers;" and in the opinion of Judge Jones, "the passenger depot." This, if possible, is rendered more manifest by referring to the kinds of property which the Supreme court decide not to be exempt: which are "warehouses, coal-lots, coal-shutes, machine shops, wood-yards, and such places." Some of these were held to be excused from taxation by the inferior court, and so far their opinion was reversed, but no further.

We have been thus particular in the examination of this case, because we differ very widely from the view taken of it in argument.

It may also be proper to remark, that the question, for what purpose a rail road company may condemn land? is a very different one from, what property of such a company is not subject to taxation?

Another position taken to sustain the complainant's right to the house, is, that it stands upon ground which was condemned under the second inquisition; which proceeding was not sanctioned by the charter, and therefore void. The argument on this subject is based upon the hypothesis, that at the in-

stance of the appellees, the first jury having condemned land for the site of the road, entirely across the farm of the complainant, to the Baltimore and Washington road, the appellees had exhausted all their powers, under the charter, to condemn his land for the use of their road ; and therefore they can claim no rights under the action of the second jury. In support of this view, the case of *Moorhead, et al., vs. Little Miami R. R. Co.,* 17 *Ohio R.,* 340, was cited. In that case the company caused the line of their road to be surveyed by their engineer, who returned his survey to the board of Public Works. They did not proceed to make their road upon the line so located, but afterwards, with the consent of the city council of Cincinnati, and by the permission of the town council of the town of Fulton, appropriated a different route. Upon this new line they constructed their road, and used it for five years and upwards. After which the company wished to change their road, and for that purpose obtained an inquisition. Upon the return of which, but before the making of the road was commenced, *Moorhead, et al.,* filed a bill in equity, and obtained an injunction to prevent the road from being made. It does not appear that the damages assessed, were either paid or tendered. The company intended to abandon the old route entirely, and take the new one located under the last inquisition. That case differs essentially from the one under consideration, in several important particulars.

Here the first inquisition was obtained in May, and the second in August of the same year; the road being unfinished. Both inquisitions were regularly returned to the county court, and both ratified on the same day. The company took possession of the land, and on part of that included in the second inquisition, they erected the passenger depot. No objection to the erection of the building was made by the complainant, until the filing of his bill, in which he claims the damages assessed under the two inquisitions. The payment of the same with interest and costs, in full satisfaction of the decree passed on that subject, has been acknowledged on record by the solicitor of the complainant. In which decree

it is provided, that on payment of the said damages with interest thereon and costs, by the company to the complainant, "the right, title and interest of the said complainant to the land and premises condemned under the charter of the said company, as appears by the proceedings in this cause, and to the extent and according to the effects of such condemnations, be, and the same shall be extinguished, and be thereupon vested in the said company.

In the case of *Stamps vs. The Birmingham and Stour Valley Railway Company*, 2 *Phillips*, 673, in 22 *Eng. Ch. Rep.*, the lord chancellor sanctioned a second compulsory proceeding, on the part of the company, to appropriate an additional quantity of the land of Stamps for the use of the road; although it was resisted upon the same ground here taken. In that case, reference is made to *Simpson vs. Lancaster and Carlisle Railway*, 4 *Railway and Canal Cases*, 625, and the lord chancellor approves of the decision there made by the vice-chancellor. A second appropriation of land for the use of that company was allowed; the additional quantity of land being wanted for a station. A very sensible reason is given by the lord chancellor, for allowing a second condemnation, if during the progress of the work, it shall be ascertained, that enough land is not taken in the first instance. Under such a rule, the company would be naturally desirous of taking as little land as would be deemed necessary for the purposes of the road. But during the progress of the work, unforeseen circumstances might occur, which would render it necessary, to have more land than was calculated on originally. If, however, such deficiency could not be supplied by a second condemnation, then, for the purpose of being sure of having enough, in many instances, the company would be induced to take more land than, in the end, might prove to be necessary. Fear of being at the mercy of the land-holder, would be very apt to produce such results. In discussing the propriety of allowing a second appropriation of land, by compulsory process, if found necessary, before the work is completed, the lord chancellor says: "This construction of

the act is more consistent than the other, with what may be presumed to have been the intention of the legislature, for it is that which the interest of these companies requires, and which does not expose land owners to any thing like the inconvenience, to which the contrary construction would subject the companies. I think the act is not only capable of such a construction, but that it is the right and proper one."

The injunction which had been granted in the case, was dissolved, and the company were permitted to go on and appropriate more land, for the construction of the road, under their second compulsory process.

So far as the provisions of the charter of the appellees is concerned, it is not perceived that the language employed, requires an interpretation, different from that given in regard to the *Birmingham and Stour Valley Railway Company.* In the report of that case, the statutes having relation to the subject, are not set forth, except only the opinion commences by saying : "It does not appear that the act has expressly laid down any rule at all, but simply, that the company are to give notice of what land they require ; in other words, that they cannot take any land *without* notice." There is nothing in the language, then, which directly allows a second condemnation, or which forbids more than one.

The 17th sec. of the act of 1826, provides, that the company may call a jury for the purpose of having an inquisition, "Whensoever it shall be necessary for said company to have, use or occupy any lands, materials, or other property, in order to the construction or repair of any part of said road or roads, or their works or necessary buildings." The expression, *whensoever* it shall be necessary, in order to the construction or repair of any part of the road or necessary buildings, is certainly very comprehensive, and must require a very forced construction, to say, it so decidedly restricts the company to but one inquisition, that the proceedings under a second are null and void, although at the time, the road was not completed but still in progress, and the land condemned was necessary.

The cases of *Stamps vs. the Birmingham and Stour Valley Railway Company,* and *Simpson vs. Lancaster and Carlisle Railway,* sanction the propriety of a second compulsory process, or inquisition, when an additional quantity of land is necessary, for the completion of a road or its necessary buildings. And that a house for the accommodation of passengers, is such a building, is fully recognized by the decision, in the case of the *Railroad vs. Berks county.*

Believing that the charter does not prohibit the calling of a second jury when necessary, before the road is finished, we might have refrained from expressing any opinion, as to whether the land condemned in the last inquisition, was necessary for the use of the company; for the reason, that the proceedings were returned to, and ratified by, the county court. A tribunal having exclusive and final jurisdiction over that matter, and from whose decision there is no appeal; as will appear by the case of *Wilmington and Susquehanna Rail road Company vs. Couder,* 8 *G. & J.,* 443. The county court was the proper place to have resisted the inquisition before its ratification. And if there is no right of appeal upon a judgment of ratification, with what propriety can it be said, that long after, when expensive improvements have been put upon the land, a court of chancery may reverse and nullify the whole proceeding?

In addition to the ratification of the second inquisition, by a court of exclusive jurisdiction, the damages therein assessed have been received by the appellant, under the chancellor's decree, passed in this case, on that subject. His claim, therefore, if he has any, does not stand upon any very strong ground of equity.

But it is contended, that admitting the land was properly condemned, and the house was erected for a legitimate purpose, it has been, and still is, used as a tavern, in which spirituous liquors are sold; which is such an illegitimate and improper use of the building, that the company have forfeited all right to the same, and the land, with the house, have reverted to the complainant, as the owner of the fee-simple title;

the company under the condemnation, having acquired nothing more than a right to the land, for the legitimate, necessary purposes of their road; which gave them simply an easement. If it be admitted, that the relative rights of the parties in regard to title, under the inquisition, are as here stated, and it be also conceded, that the company were not authorized to use the house as a tavern, or to permit any person to do so, still it is not a necessary consequence, that by such user the house is forfeited, and thereby becomes the property of the appellant. It is not denied, that whilst the tavern has been kept there, the building has been all the time made use of by the company, for the protection and comfort of passengers.

There is, therefore, no relinquishment of right by abandonment, or a cessation to employ the property for the purposes of the road. And no case of forfeiture, which bears the slightest analogy to the one here claimed, has been presented to our consideration. The principle contended for by the appellant, would subject all rail road companies to most serious consequences. No matter how expensive or how important a building may be, and although regularly employed within the proper and appropriate line of business, yet if the company, or any person by their authority, uses any part of such building for a purpose not within the scope of regular rail road business, the house is forfeited, and passes to the original owner of the land. We cannot assent to such a proposition. It is not necessary that we should do so, for the protection of the rights of individuals. If any person sustains an injury, or suffers special damage by any illegal act of such a company, the courts are fully competent to grant him redress for the past; and if necessary, to restrain or prevent the repetition or continuance of similar acts.

Under the second question presented in argument, it is insisted, that if the appellant is not entitled to the house, either because the second condemnation was void; or in consequence of a forfeiture by appropriating it to an illegal purpose, nevertheless, he has a right to an injunction for preventing the house from being used as a tavern.

Assuming the correctness of the position, that the use made of this house as a tavern, in the manner and under the circumstances disclosed in this case, we do not consider the appellant entitled to the injunction which he seeks.  He has not shewn any special injury or damage to himself.  He has no hotel in the vicinity, the profitable use of which has been diminished or interfered with.  The occupation of the house in part as a tavern, does not deprive him of the land on which it stands.  Put an end to the hotel, and still the company would be under the necessity of using the building as a passenger depot.

Believing the chancellor allowed the complainant all he was entitled to, in this case, we affirm the decree.  The damages with interest and costs, allowed in favor of the complainant, have been fully paid and satisfied, since the decree and before the appeal was taken.  He must therefore pay the costs which have since accrued.

*Decree affirmed.*