# Holmes *et al. versus* Johnson.

*Custom in Violation of Good Morals not admissible in Evidence.—Presumption of Death of absent Party.*

1. A custom is not legal if contrary to morality, religion, and the law of the land; but is unreasonable and therefore not compulsory.

2. In an ejectment growing out of a disputed title to land, the claimant being a negro born in another state, the defendant offered to prove that in the region whence the plaintiff came, it is not customary for colored people to form legal marriages, and that the majority of them cohabit promiscuously, as well among free colored persons as slaves, in order to rebut the presumption of marriage and legitimacy from cohabitation : but the offer was rejected.

*Held,* that as the testimony would have tended to establish a custom contrary to public morals and decency, the rejection of the offer was proper.

3. Where it appeared that one entitled to claim the land in common with the plaintiff, had gone to sea in 1823; and up to the time of the trial in 1861, had not been heard from, except by rumour in 1832, the presumption, after such a lapse of time, is that he was dead : and the evidence was held sufficient to justify the jury in so finding.

ERROR to the District Court of *Philadelphia.*

This was an action of ejectment brought in the court below to January Term 1862, by Severn Johnson, Samuel Johnson, James Johnson, Rachel Ann Johnson, James Ballard, and Julia Ballard, —— Ballard, Anna Maria Jenkins, Mary Hammond, and Nancy Cooper, against Philip Holmes, James Johnson, Harriet Copeland, and John D. Rex, to recover a lot of ground and the improvements thereon erected, situate on the south-east corner of Quince and Locust streets, Philadelphia.

The defendants above named were, at the time of bringing suit, tenants of the property under Margaret Hogan, who was admitted of record to defend the action.

[Holmes *et al. v.* Johnson.]

On the trial, at the suggestion of the court, the counsel for the plaintiff suffered a nonsuit as to all the plaintiffs except Severn Johnson.

The parties plaintiff and defendant were all coloured persons. The material facts were these:—

Levin Ballard, a coloured man who came from the Eastern Shore of Maryland, acquired the property in question by purchase about the year 1806, and by his will, dated August 17th 1823, and proved four days thereafter, he devised the same to his wife Hagar for life, with remainder in fee to his nephew, Moses Ballard.

Moses Ballard, by his will, dated November 15th 1832, and proved January 29th 1833, devised the property to his mother Harriet Ballard for life, with remainder in fee to his brother Joseph Ballard, who died in possession of the property in July 1857, intestate and without issue.

Upon the death of Joseph Ballard, his mother's sister, Margaret Hogan (who defended the suit as owner), being his nearest of kin, came into possession. A year or more afterwards, one Martha Wise instituted an ejectment for the premises, claiming to be a granddaughter of Henry, a brother of Levin Ballard; and subsequently the present ejectment was brought, the plaintiffs claiming to be descendants of Mary, a sister of Levin Ballard.

The suit of Martha Wise was tried on the 5th of April 1861, and resulted in a general verdict for the plaintiff. This suit was tried on the 9th of the same month.

On the trial, the counsel for defendants offered to prove:—

"That in the region from whence these people came, the Eastern Shore of Maryland, it is not the custom for the coloured people to form legal marriages; that marriage among them is the exception and not the rule; that the majority of them cohabit promiscuously, and that this mode of promiscuous cohabitation is the custom there among free coloured persons as well as slaves."

The learned judge before whom the case was tried rejected the offer, which rejection was the subject of the first bill of exceptions.

Lavinia Johnson, wife of Isaac, a brother of Severn Johnson, was called for the plaintiff and examined as a witness. In her examination in chief, she said: "Isaac was my husband; he went away to sea in 1823, and has not been heard from since." Upon her cross-examination she said: "My husband has never been heard from since he went away in 1823; he went to sea. . . . When I came to Philadelphia I heard my husband was living in Portland, Maine, and had another wife living. I last heard from

[Holmes *et al. v.* Johnson.]

my husband in 1832. It was rumoured he had another wife living. I wrote two letters to him, but never got any answer."

Upon this the court charged the jury, that the presumption was that Isaac Johnson is dead, which instruction was also excepted to.

Under these rulings there was a general verdict and judgment for the plaintiffs, whereupon the defendants sued out this writ, and assigned for error the refusal of the court below to admit the testimony embraced in the above offer, as to the custom of coloured people on the Eastern Shore of Maryland, and the instruction to the jury as to the presumption of the death of Isaac Johnson.

*Thomas H. Speakman* and *E. Spencer Miller*, for plaintiffs in error.—1. The plaintiff below claimed to be the lawful heir of the blood of the first purchaser, from whom the premises in question descended; and to entitle him to succeed, strictly speaking, it would have been necessary to show his relationship by marriage and birth through the ancestor to such purchaser, and that no other heir stood in the way of his claim. Partly owing to the great difficulty, in most cases the impossibility, of proving the relationship of past generations, the stringent rule of law is relaxed, and the declaration of those who are likely to know the fact and have no interest to pervert it are received as evidence; and on the part of the plaintiff below, some such evidence was received, and *primâ facie* perhaps it was sufficient.

Because in all cases involving the question of pedigree, proof of marriage and birth, by traditionary declaration of cohabitation, reputation, and acknowledgment, presupposes a habit or usage of mankind almost universal, to wit, that men and women do not cohabit unless they have been duly married, and that they do not accept the responsibilities of rearing children, and acknowledging them to the world as their own, unless they are born of the intercourse resulting from marriage. If such were not the habit of mankind, evidence of family tradition could not be received as tending to establish pedigree. If, therefore, it be made to appear that the well-nigh universal habits of men with reference to marriage, do not exist in a certain district of country, and among a large class of people of whom they who seek the benefits of traditionary evidence are part, the very foundation upon which rests the force of such testimony is rooted up; the legal conclusion which arises from tradition of relationship is rebutted, and proof of pedigree in that manner fails. The presumption which springs from traditionary evidence in proof of pedigree, is not one of mere law,—is not a presumption *juris et de jure.* A question of fact enters into the consideration thereof, and is first to be determined, to wit, the usages of men concerning marriages. Such a presumption is then open to be

6 Wʀ.—11

[*Holmes et al. v.* Johnson.]

rebutted by proof of a custom differing from the usual one, and applicable to the case in hand, or by counter presumptions.

To raise such counter presumption, or rather to destroy the presumption raised by the plaintiff's evidence, the defendant below offered this evidence. It is difficult to imagine a more conclusive reply to the plaintiff's *primâ facie* case, and one which would make it more necessary for him to resort to the strict and formal proof of marriage and legitimate birth. The offer of evidence of the defendant below raised none of the embarrassing questions as to when evidence of a usage is admissible, or to what extent it must be shown to exist; it was simply to show a fact concerning the well-known habits of negroes, of whom the plaintiff below was one, in a large district where such habits were in vogue, and from which district he and his alleged ancestors came; which fact, when established, was a complete rebuttal of the presumption arising from the plaintiff's evidence, and upon which the verdict was obtained. In excluding such testimony so offered by the defendant below, it is conceived the court was in error. The offer was in consonance with the theory of all trials at law; it was pertinent to the issue, and in reply to the plaintiff's case.

To hold a claimant to strictly formal proof of pedigree would, in many cases, be a hardship; but here the witness for the plaintiff claimed to be personally acquainted with the ancestors through whom title is derived, and there could be no impropriety in requiring proof of pedigree, in formal detail, when the statute lays such stress on legitimacy as to insist that the claimant shall be of the blood of the first purchaser. There is no rational ground upon which marriage can be presumed, when, in a majority of instances, marriage does not occur. It is upon the same principle that the well-known maxim of law, "*Semel furibundus semper furibundus præsumitur*," is founded: Matthews' Presumptive Ev. 20.

2. In order to succeed in a disputed title to land, the claimant must not only prove his relationship with the first purchaser, but also that there is no one having an intervening right inconsistent with his claim. In this case Isaac Johnson, if living, is of equal degree with the plaintiff; and concerning whose alleged death arises the remaining question on the record. The instructions of the court, concerning the presumption of death of Isaac Johnson, arose from a misconception of the testimony of the only witness to that point. The undoubted presumption from this testimony is the continued life of a man, who was living when last heard from. There is no ground whatever from which a counter presumption could arise. Not even had the death of Johnson ever been rumoured, and the length of time that had elapsed since the person in question was heard from, is very simply accounted for by the fact that he lived at a very great

[Holmes *et al.,* *v.* Johnson.]

distance from his wife, and in an unlawful connection with another woman, with every motive for keeping beyond the reach and knowledge of a former wife, who could and probably would cause his arrest on a criminal charge, when his whereabouts became known to her.

*James W. Latta* and *Wm. S. Peirce,* for defendants in error.— It is not to be argued that a court would permit the introduction of testimony to establish a custom or usage contrary to public morals and decency, and against public policy : 1 Bl. Com. 76. In answer to the plaintiffs' third assignment of error, they cited Whiteside's Appeal, 11 Harris 116 ; Miller *v.* Beates, 3 S. & R. 495 ; Innis *v.* Campbell, 1 Rawle 393 ; Rowe *v.* Hasland, 1 W. Bl. 404.

The opinion of the court was delivered, March 10th 1862, by

READ, J.—The plaintiff and defendants in this case are all coloured persons, and, on the trial below, the defendants offered to prove, " That in the region from whence these people came, the Eastern Shore of Maryland, it is not the custom for coloured people to form legal marriages ; that marriage among them is the exception and not the rule ; that the majority of them cohabit promiscuously, and that this mode of promiscuous cohabitation is the custom there among free coloured persons as well as slaves ;" which offer the court rejected.

A custom, however ancient, if contrary to morality, religion, and the law of the land, cannot be a legal one, and it is clearly unreasonable, and cannot be compulsory. Tried by this standard, the rejection of this offer to prove such a custom so contrary to the moral sense of a Christian community was eminently proper. There are, however, other objections to the proposed custom as stated in the offer, which it may be proper to consider :—

These persons came, according to the evidence, from near Snow Hill, on the Pocomoke river, in Worcester county, which adjoins Accomac county, on the Eastern Shore of Virginia. By the census of 1850, the slave population in the five lower counties, including Worcester, numbered 21,718, while the free coloured amounted to 14,544. In 1790, the whole number of slaves in Maryland was 103,036, whilst the free coloured were only 8043 ; whilst in 1850, the slaves were 90,368, and the free coloured 74,723 ; and in 1860, the slaves had decreased to 85,382, and the free coloured, no doubt, had increased at least to an equality, for the aggregate free population had increased 153,517 in that decade.

Now, as there is no legal marriage amongst slaves (opinion of Daniel Dulany, 1 Maryland Rep. 561 ; Jackson *v.* Lervey, 5 Cowen 402, 403), it would have been easy for any gentleman

coming from the lower part of the Eastern Shore of Maryland to have proved a very large portion of the offer: that it was not the custom for slaves to form legal marriages, and that this was the rule to which there was really no exception. Such proof would have established the custom included in the offer in the proposition of twenty-one parts out of thirty-five, and this would have varied at different periods according to the relative proportions of slave and free coloured; at the earliest period, proving the custom almost entirely from the legalized practice of the slave class.

It is certain that the institution of marriage is not only recognised by the laws of Maryland as existing with the free coloured race, but we know that, amongst slaves in the slave states, the ceremony is often performed, although not followed by the usual legal consequences. And in the census of Maryland, in 1850, under the head of marriages, married whites and free coloured are classed together, as well as the number of dwellings and families of the white and free coloured population.

We have never heard of such a custom being attempted to be proved in England, although, in a work of established reputation, in speaking of the immoral condition of certain portions of London, the following strong language is used: "We could name entire quarters, in which it seems to be a custom that men and women should live in promiscuous concubinage; where the most frightful debauchery goes on, night and day, in the lowest public houses; where the very shopkeepers make a profession of atheism, and encourage their poor customers to do the same:" London Quarterly Review, April 1861, art. 4, p. 24.

Lavinia Johnson proved that her husband Isaac went to sea in 1823, and had not been heard from since, except that in 1832 it was rumoured that he was living in Portland, Maine, and she wrote two letters to him, but never got any answer. Here was an interval of twenty-seven years, from even the last rumour to the commencement of this suit, and this lapse of time surely justified the court in charging the jury, "The presumption, under the evidence, is, that Isaac Johnson is dead. There is sufficient to justify the jury in so finding." The authorities upon this point are conclusive both in England and Pennsylvania: Nepean *v.* Knight, 2 Mees. & Welsby 894; Doe dem. Knight *v.* Nepean, 5 Bing. 86 (27 Eng. Com. Law) Exch. Chamber; Burr *v.* Sim, 4 Whart. 150; Bradley *v.* Bradley, Id. 173; Whiteside's Appeal, 11 Harris 116.

Judgment affirmed.