## Ruben Estate

*Sachs & Caplan,* for accountant.

*Harry R. Levy,* for petitioners.

*Joseph M. Gelman,* for Commonwealth.

*Samuel Goldstock,* for Jewish Community Fund of Cleveland.

*Raymond Strassburger,* p. p.

*David Roth,* for heirs of Bertha Levy.

BOYLE, P. J., October 9, 1953.—The exceptions to the decree of distribution present the question whether an absent and unheard-from beneficiary who was in several Nazi concentration camps in Europe during the late war and was last seen on January 27, 1945, in the notorious camp at Buchenwald, is presumed to have died on January 27, 1945, under the doctrine of exposure to a specific peril. The master appointed by the court recommended and the court found that the beneficiary, Benno Ludomer, died on January 27, 1945, which date is prior to the death of decedent, Carrie Ruben, who died on March 3, 1951. The finding of the court causes a lapse of the legacy of Benno Ludomer, which legacy would go to his children if the general rule of absence for seven years for the establishment of presumed death is applied. The children of Benno Ludomer are the exceptants to the decree.

At the audit of the executor's account it appeared that the whereabouts of Benno Ludomer, one of the beneficiaries, was unknown. Distribution was suspended and a master was appointed to make a search for Ludomer. The master's investigation disclosed that Benno Ludomer, who had been born in Lippe, Germany, in 1887 and had lived in Berlin until he fled to Brussels with his family in 1939, had been seized by the Nazis in 1940 when they invaded Belgium and had been in several concentration camps from that time until January of 1945. Attached to the report is an affidavit which was made by a former acquaintance and a fellow-inmate of the camp at Buchenwald stating that he saw Benno Ludomer at that camp on January 27, 1945. The prisoners at that camp were liberated eight weeks later but nothing has been heard from or about Ludomer since that time.

After the report of the master was filed, a petition was presented to the court to lift the suspension and make distribution of the funds. The court, upon the

recommendation of the master and basing the conclusion upon the doctrine of specific peril, found that Mr. Ludomer died on January 27, 1945. On November 7, 1952, a decree of distribution was entered excluding Ludomer's children because under the presumption he predeceased testatrix, who died on March 3, 1951.

Two of Mr. Ludomer's children filed exceptions to the decree alleging that the doctrine of specific peril does not apply to the facts of this case and that the finding of presumed death is governed by the general rule that seven years must elapse from the date when the presumed decedent was last seen alive. If this latter rule is followed Mr. Ludomer's death would be presumed to have occurred on January 27, 1952. He would then have survived testatrix and would take a vested interest in the estate.

The general rule is that an heir who has been absent and unheard-of for less than seven years at the death of decedent is presumed to have lived until the death of testator. To accelerate the presumption of death there must be proof that the presumed decedent was exposed to a particular and immediate danger of death: Burr v. Sim, 4 Wharton 150. Mere general perils are not sufficient: Mutual Benefit Company's Petition, 174 Pa. 1, 10. In Fanning, administratrix, v. Equitable Life Assurance Society, 264 Pa. 333, the case relied upon by the master, the specific peril rule was applied where it was shown that the presumed decedent was last seen going to fight a forest fire. It was also shown that certain persons perished in that fire and their bodies were burned beyond recognition. In Meadville Production Credit Assn. v. Haskell, 40 D. & C. 145, 150, where it was shown that a man was having business difficulties; that he suggested committing suicide by going over Niagara Falls; that his automobile was found at Niagara and a post card was received by his wife indicating that he was carrying out his threats; it was held that the

specific peril rule could not be applied because he had a free choice of life and death and there was no proof to show how he decided. In Patterson's Estate, 56 D. & C. 269, where a boy 23 years old embarked on his second airplane flight as a student pilot and he and his instructor never returned, the court found that he was exposed to a specific peril and found the date of death to be the day after he took off for the flight. In the case of a military pilot whose plane was shot down by the enemy the specific peril rule was applied: Silverstein Estate, 64 D. & C. 174.

The facts of the present case do not indicate that Mr. Ludomer was exposed to any specific or immediate danger of death as defined by the decided cases. There is no doubt that there was a general and continuing danger of death in the concentration camps but he had remained alive in camps of that nature for about four years previously and there was nothing to show that there was any greater danger of his meeting death the week of January 27, 1945, than any time prior thereto. The affidavit as to the presence of Benno Ludomer in the camp at Buchenwald on January 27, 1945, is made by one who was also a prisoner there. The fact that the affiant himself survived unharmed is strong evidence that Ludomer was not exposed to a particular and immediate danger of death. Mere general perils are not sufficient to accelerate the date of death: Mutual Benefit Company's Petition, supra. Any presumption that he was removed to another camp or to parts unknown within that week is just as logical as the presumption that he was put to death or died during that week. The general rule should be applied in this case and the date of presumed death should be seven years after the date on which he was last seen alive. This date is subsequent to the death of testatrix.

The exceptions filed to the decree of distribution should be sustained, the decree should be modified, and

distribution of the share of Benno Ludomer should be made to the duly appointed personal representative of his estate.

A final decree will be entered in accordance with this opinion.

### Dissenting Opinion

Cox, J., October 9, 1953. — The specific question raised by the exceptions is, Was the auditing judge warranted by the evidence before him in finding that Benno Ludomer died in Buchenwald Concentration Camp between January 27, 1945, and the time of liberation of Buchenwald in April 1945, or was he required to find that Benno Ludomer was presumed to have died seven years after he was last seen in Buchenwald on January 27, 1945, and to fix the date of his death as of January 27, 1952?

Paragraph thirteenth of decedent's will provides as follows:

"Thirteenth: I give and bequeath the sum of Five Thousand dollars ($5,000) to my sister-in-law, Bertha Levy, and direct that she distribute the said sum in equal shares among the grandchildren of my husband's half-sister, Mrs. Primmet. She shall not be required to give bond nor to render an accounting."

At the audit of decedent's estate the legacy provided in paragraph thirteenth of decedent's will was claimed, through counsel, by Sally Bieber, who asserted that she is a grandchild of Mrs. Primmet, whose correct name was established as Mrs. Primmet Ludomer, and by Hilda Sanders and Steve Ludomer, who asserted that they are children of Benno Ludomer, a grandson of Mrs. Primmet. Bertha Levy having predeceased testatrix, the auditing judge was requested to make distribution directly to the claimants. Insufficient evidence having been presented at the audit to determine if Benno Ludomer was alive or dead, or, if dead, the date of his death, the auditing judge suspended dis-

tribution of the legacy bequeathed under paragraph thirteenth of decedent's will, and appointed Edward E. Pearlman, Esq., master, to inquire into the facts pertaining to the existence of Benno Ludomer.

After a careful investigation the master reported to the court. In his report he concluded that Benno Ludomer had died in Buchenwald, a German prison camp, sometime between January 27, 1945, and the time of liberation of Buchenwald in April 1945.

The auditing judge, after reviewing the master's report and the evidence submitted to him, also concluded that Benno Ludomer had died in Buchenwald sometime between January 27, 1945, and the time of liberation in April 1945, and that, Benno Ludomer having predeceased Carrie Ruben, testatrix, his children, Hilda Sanders and Steve Ludomer, had no interest in the legacy bequeathed in paragraph thirteenth of testatrix's will. The court, without opinion setting forth this conclusion, but basing its decree on it, denied the claim of Hilda Sanders and Steve Ludomer, and decreed the entire legacy provided for in paragraph thirteenth of testatrix's will, less the master's fee and expenses, to Sally Bieber. Hilda Sanders and Steve Ludomer have excepted to this decree.

Exceptants contend that the evidence presented to the master and set forth in his report does not sustain the auditing judge's conclusion that Benno Ludomer perished in Buchenwald prior to April 1945, but raises the presumption that Benno Ludomer died seven years after January 27, 1945, the date he was last seen or heard of, which latter date the auditing judge is required to fix as the date of his death.

Benno Ludomer was born in Lippe, Germany, on April 4, 1887. Sometime in his life he moved to Berlin and resided there until January 1939, when he and his family fled the Nazi terror and emigrated to Brussels, Belgium. Following the invasion of Belgium by the

Germans in 1940, he, together with his son and son-in-law, was interned by the Germans and sent to Camp de Jurs, a concentration camp in southern France. He was transported to Poland, and, according to the records of the International Tracing Service, was confined to Camp Auschwitz in 1942. A letter from a friend, Ludwig Weinber, establishes that Benno Ludomer was transferred from Camp Auschwitz to Camp Buchenwald in Germany, where he was last seen by Weinber on January 27, 1945. January 27, 1945, is the last time anyone saw or heard of Benno Ludomer.

Following the liberation, Benno Ludomer's family returned to Brussels, Belgium, and reëstablished the family shirt manufacturing business. They inserted a commercial advertisement in the "Aufbau," a newspaper, which was seen by Ludwig Weinber, who wrote the following letter to them:

"Brussels, 23.7

"Dear Family Sanders

"I wanted already for a long time to write you but you know that I was always a little lax in writing. Therefore, please pardon me and when you answer we will remain certainly in communication.

"One hears here in Brussels that you are slowly in your shirt business again getting on which I wish with my whole heart. Have read your address in the 'Aufbau' and see you have not lost courage. Pity it is that the beloved parents are not about to see that. They would have been a great help to you. When I was on the transport from Auschwitz to Buchenwald with Hilda's blessed father he said yet when I and my children hold through this time we will surely become the biggest shirt makers of Brussels. Pity he is not about. The war was almost over when I talked to him. Never will I forget that day. It was the 27th of January, 1945, upon our arrival at Buchenwald. Had he gone

through another eight weeks would he certainly yet live.

"My dear ones, how are you and how is your little son? He must be quite a man by now. There is not much to write about myself. I just came back from my holidays, was in Knocke and am sorry as thick as a barrel.

"I would be very pleased to hear from you soon and will answer at once.

"With much love

"Your

"Lud

"My address is:
Ludwig Weinber
Bruzells, rue Cirquie 24
Belgium"

The following affidavit by Ludwig Weinber was also presented to the master:

> "Kingdom of Belgium )
> City of Brussels ) ss.
> Embassy of the United )
> States of America )

"Ludwig Weinber, being duly sworn, deposes and says:

"1. I reside at 23 Rue du Cirque, in the City of Brussels, Kingdom of Belgium.

"2. I met Mr. Benno Ludomer for the first time in about the year 1939, when I stayed in Brussels.

"3. I met Mr. Benno Ludomer again when we both were inmates of the concentration Camp de Jurs, in Southern France, from 1940 to about 1942.

"4. I was then brought to several concentration camps and met Mr. Benno Ludomer again when I arrived at the concentration camp at Buchenwald, Germany, on January 27, 1945, when I had a long talk with him.

"5. After that talk, I did not see him again, and I have no definite information what happened to him.

"6. I know that this affidavit will be submitted to the Master appointed by the Court of Pittsburgh, Pennsylvania, for the purpose of exploring the facts and circumstances surrounding the absence and disappearance of Benno Ludomer.

"Ludwig Weinber
Sworn to before me this
19th day of August, 1952.
(Seal of
American Consular Service, Brussels, Belgium)
"George W. Skora
Counsul of the
United States of
America"

The following principles have been firmly established in the body of the law of this Commonwealth. When a person has disappeared under circumstances which do not explain his disappearance and has been unheard of for a period of seven years his death is presumed to have occurred seven years after he was last seen. If, however, he encountered a special peril which might reasonably be expected to destroy life a finding of death prior to the expiration of seven years from his disappearance may be made: Burr v. Sim, 4 Wharton 150; Mutual Benefit Company's Petition, 174 Pa. 1; Fanning, Administratrix, v. Equitable Life Assurance Society, A. S., 264 Pa. 333.

Benno Ludomer was 58 years of age when he was last seen at Buchenwald by Ludwig Weinber approximately eight weeks before the liberation. For a period of five years he had been confined to various concentration camps, the horrors of which are too well known to need description. Buchenwald, where he

was last confined, as far as we know, was a notorious prison wherein the Germans carried out a policy of exterminating their Jewish citizenry. Jews were confined in Buchenwald for the purpose of extermination in gigantic crematories used for that purpose. Death also came to many from starvation, disease, and physical abuse. In consideration of these facts, there can be no doubt that Benno Ludomer was subjected to a specific peril, the peril of having the Germans carry out their avowed intent to exterminate all their Jewish citizens, as well as Jews from other countries captured on invasion. Although it is true that all of the Jews confined at Buchenwald were not killed, as is evidenced by the liberation of Ludwig Weinber, the number freed or released from Buchenwald was a pathetically small part of the great numbers confined there. Although the above facts relating to the Nazi policy of extermination at Buchenwald were not testified to, the horrors of Buchenwald are so well known as to warrant this court to take judicial notice of them.

Was Benno Ludomer one of the fortunate few who escaped extermination at Buchenwald? His age, the long period of his confinement in various prison camps, the fact that he was not seen after the one instance in which his friend Ludwig Weinber talked with him in Buchenwald, his failure to return to Brussels to ascertain the whereabouts of his family after the liberation, the failure to have any record of him by the agencies which were established after the liberation to ascertain the whereabouts of Jews who had been confined to various German concentration camps—all lead to but one conclusion: Benno Ludomer died in Buchenwald sometime between January 27, 1945, when he was last seen by his friend, Ludwig Weinber, in Buchenwald, and April 1945, when the persons confined in Buchenwald were liberated. This finding is dictated by the legal principles quoted above.

The date of death of Benno Ludomer having been fixed as at a time prior to the death of Carrie Ruben, testatrix, exceptants have no interest in the legacy provided for in paragraph thirteenth of the will of Carrie Ruben. The exceptions, therefore, should be dismissed.